360 So.2d 1203 (1978)
NORTH AMERICAN MORTGAGE INVESTORS
v.
MISSISSIPPI HARDWARE COMPANY, INC., et al.
No. 49889.
Supreme Court of Mississippi.
May 17, 1978.
Rehearing Denied August 9, 1978.
Young, Scanlon & Sessums, John Howard Shows, Pat H. Scanlon, Brunini, Grantham, Grower & Hewes, Richard W. Dortch, Jackson, for appellant.
Ward, Martin, Terry, Way & Parker, M.E. Ward, Ramsey, Bodron, Thames & Robinson, *1204 Ellis B. Bodron, Loyacono & Field, Paul Kelly Loyacono, Vicksburg, Gray, Montague, Jackson & Pittman, James C. Pittman, Jr., Hattiesburg, Watkins, Pyle, Ludlam, Winter & Stennis, Walker W. Jones, III, Jackson, for appellees.
Before ROBERTSON, SUGG and WALKER, JJ.
WALKER, Justice, for the Court:
This is an appeal from a decision of the Chancery Court of Warren County, Mississippi, in which the priority of the mechanics' and materialmen's liens of appellees, Summit Building, Inc., Home Comfort, Inc., Clow, Inc., Katsaboulas Tile Company, Mississippi Hardware Company, Mid-South Lumber Company, L.L. Stevenson, and Specialty Coating, Inc., and the subordinated mortgage of Morrison-Quirk Grain Corporation, were established over the construction mortgage of North American Mortgage Investors (NAMI) following NAMI's foreclosure of its deed of trust against the subject property. The total amount of the judgment was $441,141.07 out of a total of $1,540,000 realized by NAMI at the foreclosure of the subject property.
The appellee subcontractors and materialmen contend that NAMI failed to use reasonable diligence in disbursing funds to the general contractor to see that they were paid for services and materials rendered. Morrison-Quirk Grain Corporation also contends that NAMI failed to use reasonable diligence to see that all funds it disbursed actually were used for construction purposes as required by the terms of the agreement which subordinated Morrison-Quirk's deed of trust to NAMI's deed of trust.
The property in question was an apartment complex of over three hundred units called Confederate Quarters. Construction on the project began in July 1973 shortly after the loan agreement was concluded between NAMI and Bierman Realty, Inc., the owner of the land. Bierman Realty, Inc. and Confederate Construction Co., Inc., the general contractor on the project, were both wholly owned and operated by Bernie Bierman.
During the period of construction the procedure used by NAMI in disbursing funds to Confederate Construction Company was as follows: Confederate Construction Company would first prepare an application for payment which listed all of the categories of work and material involved in the project, the total amount allocated to each category, the amount already expended for each category, the estimated amount to complete each category, and the amount currently requested. On the application for payment form, there was a certification which stated that the applicant (Bierman's Confederate Construction Company) certified that the work covered by the application had been completed and that all amounts had been paid by him for work on which previous applications for payment had been submitted. These certifications were signed by either Bernie Bierman or William Weathersby, Confederate Construction Company's superintendent. In addition, the attorney for the title insurance company, who searched title for liens, took an affidavit from Bierman prior to each draw that no amounts for materials or labor were due beyond that requested. In conjunction with the application for payment submitted by Confederate Construction Company, the project was inspected by a consulting engineer, hired at NAMI's direction, who rendered a comprehensive report on the status of the project. These reports included an estimate of the value of the work in place for each work category and the estimated cost to complete the project. The figures indicated whether the value of completed work was in line with loan amounts advanced for actual construction costs and whether the undistributed balance of the loan was sufficient to complete the project.
In Wortman and Mann, Inc. v. Frierson Building Supply Company, 184 So.2d 857 (Miss. 1966), we held that a construction lender's mortgage has priority over the statutory liens of materialmen and subcontractors to the extent to which the construction lender is able to show that it used *1205 reasonable diligence to see that the funds it disbursed were used in payment for materials and other costs in the construction of the building. In that case, we found that the construction lender had used reasonable diligence by taking affidavits from the general contractor prior to each disbursement that he did not owe for any labor or materials beyond that requested and by searching title for liens prior to each disbursement.
The appellees argue that the instant case is distinguishable from Wortman and Mann in that NAMI had notice of facts which would have prompted a reasonably careful lender to take steps to insure payment of materialmen and subcontractors beyond those taken by NAMI. The salient facts relied upon by the appellees are as follows:
(1) Prior to the execution of the loan agreement, NAMI discovered that Bernie Bierman had failed to list on his financial statement $147,006.71 worth of judgments which were liens of record against the subject property;
(2) In September 1973, Morrison-Quirk Grain Corporation filed suit against NAMI and Bierman Realty, claiming that they had defrauded Morrison-Quirk. The basis for this claim was an unrecorded mortgage from Bierman to Morrison-Quirk on the subject property which Bierman, through his attorney, had allegedly promised to record on behalf of Morrison-Quirk. This unrecorded mortgage was given to Morrison-Quirk prior to the mortgage to NAMI. The lawsuit was settled with Morrison-Quirk accepting a mortgage subordinate to NAMI's;
(3) In October 1973, Kenneth O'Brien, NAMI's agent for the administration of the loan, received telephone calls from Bernie Bierman and William Weathersby requesting an advance against the next draw to pay subcontractors who allegedly needed the money to make their own payrolls. Although none of the paper work to substantiate this request was in, O'Brien made the advance after receiving a telephone report from the attorney for the title insurance company that there were no liens of record and after receiving an oral report from the consulting engineer that the work to be paid for by the funds requested was in place;
(4) In late October or early November 1973, O'Brien received a telephone call (or calls) from Ray Grein, the president of Summit Building, Inc., and from Summit's attorney informing him (O'Brien) that a check to Summit for $100,000 had bounced but had been made good; and
(5) Shortly after Ray Grien called, O'Brien was told by William Weathersby, Confederate Construction Company's superintendent, that apparently not all of NAMI's funds were going into the project.
At this point, O'Brien asked Bierman to respond to Weathersby's charges but continued to fund while waiting for Bierman's response. Bierman's response, in early December 1973, was not acceptable to O'Brien, who ceased funding until Bierman's books were audited. This audit showed that while Bierman had commingled NAMI's funds with money used for and derived from other projects, all of NAMI's funds had gone into the construction of Confederate Quarters. Funding was resumed in March 1974 under a new procedure whereby funds were paid not to Bierman for distribution to subcontractors and materialmen but rather were paid directly to such subcontractors and materialmen by the trustee of a trust account which was established for that purpose.
We are of the opinion that although NAMI may have been aware of facts which indicated that Bierman was an imprudent or haphazard businessman, these facts did not amount to actual knowledge that mechanics and materialmen were not being paid. This is particularly true in light of the abundance of safeguards heretofore enumerated that were employed by NAMI to insure that the funds which it was disbursing were going into the project and assure that mechanics and materialmen were being paid. We have carefully considered the procedures employed by NAMI in disbursing construction funds and hold that NAMI acted with reasonable diligence to see that all of the monies it disbursed were used in payment of materials and *1206 other costs in the construction of Confederate Quarters.
None of the appellees advanced any affirmative arguments in support of the judgment on appeal here other than their contentions that NAMI did not use reasonable diligence in disbursing funds. In addition, none of the appellees cross-appealed, with the exception of Summit Building Inc. However, it is not necessary for us to consider this cross-appeal, which is related only to the amount which Summit was awarded by the chancellor, because we now hold that having used reasonable diligence in disbursing funds, in the absence of actual knowledge or facts amounting to actual knowledge that the disbursed funds were not going into the project, NAMI was not liable to any of the appellees.
REVERSED ON DIRECT APPEAL AND JUDGMENT ENTERED FOR APPELLANT AND CROSS-APPEAL DISMISSED AS MOOT.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, BROOM, LEE, BOWLING and COFER, JJ., concur.