## GRENADA READY–MIX CONCRETE, INC, Plaintiff,

v.

## Charlie WATKINS et al., Defendants.

### No. WC 76–128–K.

United States District Court,
N. D. Mississippi, W. D.

July 19, 1978.

---

Grady F. Tollison, Jr., Oxford, Miss., for plaintiff.

Will A. Hickman and S. T. Rayburn, Oxford, Miss., for Travis.

Richard M. Edmonson, Jackson Miss., for Hart-Freeland-Roberts.

Scott Welch, III, Jackson, Miss., for Guaranty.

Marshall W. Criss, Memphis, Tenn., for Watkins.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this Mississippi-based diversity action filed December 23, 1976, Grenada Ready-Mix, Inc. (Grenada), plaintiff, brought suit against Guaranty Mortgage Company of Nashville (Guaranty), Randall Travis, individually and as trustee (Travis), Hart-Free-land-Roberts, Inc. (architect-engineers), Charlie Watkins (Watkins), and Sevenprop Associates (Sevenprop). The complaint contained three counts. Count I charged that defendants, jointly and severally, were guilty of tortious conduct which resulted in a void foreclosure of a deed of trust upon Grenada's real property in the vicinity of the City of Grenada, Mississippi, asserting that the foreclosure sale should be set aside; Count II alleged that Guaranty, Travis and Watkins were, jointly and severally, guilty of fraud and gross negligence toward Grenada, for which it sought to recover substantial compensatory and punitive damages; and Count III averred that Watkins, Travis, the architect-engineers, and Guaranty, jointly and severally, were liable for tortious conduct for which substantial actual and punitive damages were claimed. Thus, the total relief sought against all parties defendant involved not only invalidation of the foreclosure sale on Grenada's real property but an award of $1,250,000 as actual damages and $1,000,000 as punitive damages, with reasonable attorney fees and costs.

On February 21, 1978, Watkins, on motion of Grenada, was dismissed as a party defendant without prejudice.[1] Separate answers denying liability on behalf of all of the remaining defendants were timely filed. On April 5, 1978, Sevenprop, the innocent purchaser for value from Guaranty, who was the successful bidder at the foreclosure sale of the deed of trust against Grenada's property, was granted summary judgment

and finally dismissed from the case. These actions left as defendants Guaranty, a mortgage banking company doing business at Nashville, Tennessee, Randall Travis, Guaranty's vice-president in charge of commercial loans, sued individually and as trustee in Guaranty's deed of trust against Grenada's real property, and Hart-Freeland-Roberts, Inc., a firm of architects and engineers, whose participation in the case was through its draftsman-agent, Don Petty. The court conducted a four-day evidentiary hearing commencing June 19, at which time all parties offered oral and documentary evidence. Counsel have supplied the court with pretrial briefs and have been afforded oral arguments, making the case ripe for final decision on the merits.

## I. FACTS

Grenada, a Mississippi corporation, was in 1973 the owner of a 10-acre parcel of vacant, unimproved land which fronted U.S. Highway 8, and was located west of Grenada's city limits near the intersection of Highway 8 with Interstate 55. This property, regarded as a prime location for commercial development, had been owned by Grenada for a number of years. Grenada was, in 1973, a wholly-owned corporation, of which Grady Green was president and his wife, Frances B. Green, secretary; together they owned all of the corporate stock. Green, then 60 years of age, had personally been extensively engaged in construction work of all kinds, commencing in the ready-mix concrete business after World War II. For the ensuing 32 years, his firm was continuously engaged in erecting various buildings as well as supplying concrete to the public. Among other structures, Green developed the Grady Green Shopping Center on old Highway 51 south of Grenada, and had built a shopping center at Kosciusko, composed of several free-standing units. Since 1973 Green has engaged in the development of still another shopping center adjoining the one in issue, which was proposed

---

1. At time of suit, Watkins had been declared bankrupt, his estate being administered by the federal district court at Memphis, Tennessee.

to be erected by Watkins, an individual who first did business as a corporation under the name of Watkins Investment Company and later as a partnership under the same name. Mrs. Green, a college graduate, kept Grenada's business records and her husband's other business operations under the supervision of an auditor. She routinely prepared financial statements and also served as an advisory member on the Board of Directors of the Grenada Bank. Mrs. Green was aware of, and participated in, most major decisions which were largely conceived and developed by her husband relative to the business carried on by their company.

### (a) Nature of Project.

In the spring months of 1973, Green was approached by Watkins' representatives, Joe Byrd and David Martindale, regarding the possibility of the development of Grenada's 10-acre unimproved parcel as a commercial shopping center. Martindale conducted the initial negotiations on behalf of Watkins and advised Green that the Watkins' organization was prepared to offer a ground lease of $25,000 annually for a 25-year term, with three optional extensions of five years each, subsequent to their acceptance of which Watkins would erect a shopping center with Magic Mart and a major grocery chain (later identified as Big Star) as the two principal or "anchor" tenants, leaving large and small mall spaces for speculative purposes. Martindale and Byrd represented that the shopping center improvements, estimated to contain approximately 96,000 square feet, would be erected at a cost of $1,125,000. They represented that Grenada, as a condition for the lease, would be required to join in the construction loan to be secured from a lender, without personal liability upon Grenada or the Greens, but subjecting the latter's fee simple title to a first mortgage lien required by the lender.

After Green manifested interest in this proposal, Watkins personally met Green in July 1973. Watkins confirmed what his agent had told Green; Green and his wife were agreeable to entering into the proposal. The parties went to the offices of Grenada attorney William B. Fedric, Green's legal counsel, who drafted the lease instrument. On July 9, Grenada entered into a 25-year lease agreement beginning July 1, 1973, with Watkins.[2]

The document provided that rent would be payable during the primary term at the rate of $2,083.34 per month, with the first month's rent commencing "upon the completion of the first building to be constructed on the above described property by the lessee (Watkins) or on January 1, 1974, in the event the first building had not been completed by that time." It was further provided that upon the request of Watkins, Grenada would execute "the necessary instrument or instruments subordinating its lien on the [leased property] to the lien of the security instrument to be executed by [Watkins] for temporary construction money to construct improvements on the above described property and also the lien of the security instrument to be executed by [Watkins] for permanent financing of the entire project when construction is completed." It was agreed that the lease would be a "net lease" with Watkins paying all ad valorem taxes becoming due upon the leased premises during the primary term and any effective optional period. The lease further recited that in consideration for its execution, Watkins agreed that all the improvements placed upon the leased property would become the property of Grenada upon the termination of the lease. The lease contained other provisions not here relevant except that the parties agreed to execute a short-form lease to be used for recording purposes in lieu of recordation of the long-form lease. Simultaneously, a short-form lease was executed between Grenada and Watkins, and promptly filed for public record.

---

**2.** The original lessee was Watkins Investment, Inc., of Mississippi; the name of the lessee was on August 10, 1973, changed to Watkins Investments of Mississippi, a partnership consisting of Watkins and associates including Joe H. Byrd.

(b) *Watkins, the Commercial Developer.*

Watkins, then a resident of Jackson, Tennessee, had for a number of years been in the commercial development and construction business; he, or his organization, had built a number of shopping centers in the states of Tennessee, Kentucky, Arkansas, and also in Mississippi, where they had erected three at Jackson and one at Oxford. In 1973, Watkins had under way the construction of fifteen commercial projects, at least twelve or thirteen of which were commercial shopping centers similar to the one which he contemplated at Grenada, Mississippi. A person of reputedly large net worth, having an income exceeding $500,000 annually, Watkins regularly obtained financing from four different mortgage companies. In 1970, he commenced doing business with Guaranty, a mortgage banking firm with offices at Nashville and Jackson, Tennessee. Watkins was obtained by Travis as a customer for Guaranty; in time he became one of the three largest borrowing customers on Guaranty's books. From 1970 to 1973, prior to the Grenada transaction, Guaranty had made loans to Watkins aggregating in excess of $30,000,000. During that period of time, Watkins had always met his obligations regularly; all materialmen and labor expenses on his various construction jobs had been paid; and Guaranty had encountered no difficulty in servicing his construction loans and obtaining permanent financing with life insurance companies or other institutional lenders on Watkins' completed projects. Watkins submitted periodic audited financial reports.

As regards the Grenada development, Watkins submitted to Guaranty a pro forma income analysis on which it projected lease revenues from Magic Mart for a 44,000 square foot store at an annual rental of $66,000, from a Big Star supermarket (originally projected as a Liberty store) for 20,000 square feet at an annual rental of $39,000, from a drug store of 12,000 square feet for $23,500 annually, and a speculative mall development for local shops totaling 20,000 square feet, for an estimated rental of approximately $30,000 per year. The 10-acre parcel owned by Grenada was valued at $250,000 and offered to Guaranty as collateral along with the ground and tenant leases. Watkins was able to obtain Guaranty's approval for a construction loan of $1,125,000 with which to erect the shopping center. On September 11, Guaranty executed a stand-by agreement committing itself to permanent financing at an interest rate of 11% per annum, in consideration for the payment of a 3% commitment fee based on the amount of the loan.[3]

(c) *Guaranty, the mortgage bankers.*

After completing the arrangements with Guaranty, Watkins executed his promissory note and deed of trust against the real property, subject to the ground lease between him and Grenada; Watkins then presented the deed of trust to Green and his wife for their joinder on behalf of Grenada. All three parties went to the law office of Attorney Fedric where the deed of trust was reviewed and approved by Fedric and signed by the Greens as Grenada's officers. The deed of trust specifically recited that Grenada joined in the instrument as fee owner "for the purpose of subordinating its interests and mortgaging the fee in the property owned by it, without, however, assuming or agreeing to any liability (other than its ownership in the fee) to the mortgagee." The deed of trust, of course, recited that it secured the payment by Watkins of a $1,125,000 loan from Guaranty, providing that in event of default in paying the indebtedness or any installment, Guaranty would be authorized to accelerate the matu-

---

**3.** This commitment expressly stated that it would expire September 1, 1974, on which date all construction must be completed, and the personal endorsement of Watkins would be required. It was the understanding of Guaranty and of Watkins that such stand-by agreement, though it insured Watkins the capacity to obtain permanent financing, was at a cost much greater than that likely to be obtained from a major institutional lender. The fee for the standby agreement, however, was, along with costs of inspection, interest during the construction period, and other loan expenses, figured in the amount of the commitment for the temporary construction loan.

rity of the entire debt and cause the trustee named therein, Randall Travis, or his substitute, to foreclose the collateral, including the realty, the ground lease in favor of Watkins and all tenants' rentals derived thereunder, by proceedings conducted in accordance with Mississippi law. The deed of trust dated October 1, 1973, was promptly filed for record upon its execution.

Guaranty understood that Watkins would, through his own organization, construct the Grenada Shopping Center and would deal only with subcontractors. Watkins had on his staff architect-draftsmen who routinely prepared plans and specifications for his use. Watkins procured a survey of Grenada's property and prepared a plot plan. These documents, along with the promissory note secured by deed of trust executed for temporary construction funds, and assignment of leases with major tenants, were tendered to Guaranty to consummate the construction loan. Guaranty's practice, for years, had been to advance funds to Watkins in accordance with the work's progress on various construction jobs, shopping centers and other construction work which Watkins had previously concluded without difficulty. Guaranty, however, required that the independent firm of Hart-Freeland-Roberts, architects and engineers of Nashville, assign one of its employees to make periodic inspections as to the percentage of completion on each occasion that Watkins might request a partial draw of funds to defray costs of construction.

(d) *Advance of Funds During Progress of Work.*

The evidence shows without dispute that in accordance with long-established custom, Watkins, to obtain a drawdown, was required to furnish, and did furnish, to Guaranty four items or documents:

1. His voucher request.
2. His affidavit as project owner of items of work done.
3. A certificate executed by Don Petty for the architectural firm stating, after examining the job site on a speci-fied date, the percentage of the job completed.
4. Owner's affidavit to Mississippi Valley Title Insurance Company that Watkins had fully paid all construction costs and the absence of any mechanics, materialmen or other claim costs for unpaid items, together with an attorney's up-date of search of land records showing the absence of filing of any liens by materialmen or laborers against the property.

Watkins proceeded to draw against the construction loan partial installments on the dates and in the amounts set forth below:

| Date | Amount | |
|------|--------|---|
| 10–5–73 | $125,275 | |
| 11–13–73 | 175,852 | |
| 12–12–73 | 172,729 | |
| 1–15–74 | 94,945 | |
| 2–11–74 | 79,192 | |
| 3–11–74 | 22,660 | |
| 7–12–74 | * 32,080 | * This draw was credited to Millington, apparently an error |
| 8–13–74 | 114,818 | |
| 9–10–74 | 97,407 | |
| Total | $914,958 | |

On the occasion of each drawdown, Watkins complied with Guaranty's requirements by executing the customary voucher request and owner's affidavit of job completion, obtaining from Petty a certificate of the percentage of completion, including materials in place and at the job site, and procuring title updates obtained by attorney Fedric and supplied through Mississippi Valley Title Insurance Company indicating the absence of any filed materialmen or laborers' liens.

On October 14, 1974, Guaranty made an additional advance, however, to Watkins for $175,157 without obtaining a title update search from attorney Fedric; yet on that date no liens by an unpaid claimant had actually been filed as provided by state law. The total of all draws, $1,090,115, left a balance of $34,885 in the Watkins' loan account, which sum Guaranty declined to disburse because of its awareness that Watkins had become involved in severe financial difficulties.

As of November 4, 1974, Tuttle, Guaranty's appraiser, stated that according to estimates on file, $101,618 additional funds were required to complete the project, thus causing an overdraw of $66,733. In addition, unpaid bills owed to materialmen and laborers on the Grenada Shopping Center amounted to not less than $130,000, according to Watkins' records. Additional outlays of at least $231,618 would be needed to complete the shopping center. On March 8, 1974, Magic Mart and the small mall area were 100% complete; on November 11, 1974, Big Star Grocery was 100% complete, with the remaining large mall on the latter date 97% complete. Thus, the value of the completed improvements, exclusive of land value, according to Petty's certificates, was $1,008.380.[4] Since total additional funds of $231,618 were required to pay bills and to complete the project, it thus follows that the cost overran the loan by $114,998.

There was opinion evidence from Byrd, Martindale and Grady Green, experienced builders, that the shopping center could have been completed within Guaranty's loan of $1,125,000. There was contrary evidence from Travis, Freeland, as well as Watkins, that unprecedented escalating costs of materials and labor, during the inflationary period in 1973 and 1974, rendered it impossible to construct the 96,000 square foot shopping center, with proper finish, within the amount of the loan. Green readily conceded his awareness of inflationary costs of labor and materials occurring during this period. It is established by credible evidence that, as of November 1974, $1,008,380 advanced by Guaranty had been expended on the project, which was then incomplete and required additional outlays to make the entire cost of the shopping center project exceed the construction loan by $114,998. Although counsel for Grenada baldly asserts that Watkins' methods, by use of expensive airplane and helicopters, were wasteful, and this must have drained funds otherwise available for construction, there is no solid evidence that Watkins diverted funds advanced by Guaranty for construction at the Grenada job site. To act upon this innuendo would be to ignore the large-scale operations which Watkins had carried on for years in dealing with various major lenders, tenants, property owners, wholly unrelated to the Grenada project. Indeed, Watkins, during 1973–74 had borrowed on construction projects then underway, $20,000,000, of which Guaranty had lent no less than $14,000,000. Courts cannot make adjudications upon mere speculation and innuendo. Therefore, we find no basis in fact for the assertion, or claim, that diversion of funds by Watkins accounted for the unfinished condition or state of the Grenada project. Grenada offered no proof that Guaranty's construction funds were diverted from the project, and that Guaranty acquiesced therein. Contrariwise, we find it more reasonable to infer, and find as a fact, from the whole evidence that the total amount of Guaranty's loan, though expended upon the job, was inadequate to complete the shopping center as planned by Watkins, and this inadequacy of borrowed funds was solely attributable to increased costs of labor and materials, at an unanticipated high rate during 1973–74. This conclusion is supported by the fact that Watkins, with a successful track record as a commercial developer, simultaneously failed on many other commercial jobs, including various shopping centers similar to Grenada. The evidence fails to show any condition at Grenada which uniquely caused that project to fail for causes imposing liability upon anyone except the bankrupt Watkins.

The substantial evidence is to the effect that Guaranty's method of doing business in advancing temporary construction funds, pending permanent financing with a major institutional lender, was in keeping with the established custom of mortgage banking in the Mid-South area. Moreover, according to such custom, where the commercial developer did his own construction, it was neither customary nor necessary for formal construction contracts to be made,

---

4. The estimated value of completed improvements, $1,008,380, plus the outstanding liens, $130,000, is $48,265 more than the total of Guaranty's advances to that date.

and constructions costs, in lieu of contracts, were estimated by experienced developers and made the basis upon which temporary financing would be granted by mortgage bankers. Also, in accordance with custom, experienced commercial developers frequently did not employ independent engineers and architects to draw plans and specifications but developed such within their own organization, in which eventuality the mortgage bankers customarily followed the same procedure of having a limited inspection of degree of completion verified by an independent firm of architects, such as Hart-Freeland-Roberts. Despite Grenada's contrary assertion, the established custom in the construction trade was for commercial builders to operate their construction jobs from a single bank account, or several such accounts, with separate records maintained on the cost allocated to each construction project. Separate check books were kept on each job under the direction of Watkins' office manager and controller. We find nothing sinister in Watkins' organization operating in that manner, or the absence of further "accounting" to Guaranty beyond the documentation required at each partial advance of loan funds. Plaintiff's expert, Dr. Fenstermaker, Professor of Economics in Banking, was without knowledge as to the custom prevailing among mortgagees of not requiring construction borrowers to submit evidence of paid materials and labor as a condition for releasing funds. The most credible evidence, as established by Travis, Leroy Simpson of Nashville's First American National Bank, and Robert Evans, President of Hart-Freeland-Roberts, was that construction loans in mortgage banking are advanced upon the independent certification of architects hired to protect the lender.[5]

(e) *Agreement Between Architect-Engineers, Watkins and Guaranty.*

The agreement between Watkins and Hart-Freeland-Roberts was that their agent, Petty, would visit the site upon the occasion of each draw request and, from checking the plans at the job site against the work in place and materials on hand, make a professional judgment as to the percentage of completion of each aspect of the project. Petty's firm was not hired to supervise the job, a task which would require at least weekly detailed inspections, in which case his responsibility would extend to ascertaining whether the work in place or materials on hand were in compliance with Watkins' plans and specifications found at the site in the possession of the job superintendent. Instead, the engagement of the Hart architectural firm was limited to a determination of quantity, and not quality, of completion, including work in place as well as materials on hand. Guaranty had insisted that Watkins make this contractual arrangement with Hart-Freeland-Roberts, a highly reputable firm of Tennessee architects and engineers. This procedure Watkins was required to follow on jobs involving many previous commercial and shopping center jobs, for which Watkins had obtained temporary construction financing from either Guaranty or other mortgage bankers. Unquestionably, this type of limited inspection service performed by the Architects and Engineers was what both Guaranty, the lender, and Watkins, the client, desired. Despite conflicts in the evidence about "fly over" inspections, the credible evidence is, and the court finds as a fact, that on each drawdown visit Petty made a reasonably proficient inspection of the percentage of completion, though necessarily of a cursory nature due to the type of contract with their client, Watkins. It was not unusual for Petty to visit, by airplane in a single day, several job sites and submit his inspection reports to Guaranty. His inspections nonetheless were properly done, and, when justified, his calculations resulted in altering Watkins' draw requests. Petty's firm was not employed, nor did they investigate, to determine if Watkins had

---

**5.** The particular form of voucher requests used by Watkins had been developed for residential construction which was subject to local inspection and did contemplate the submission of paid invoices by a contractor, a practice which customarily was not contemplated with commercial construction subject to architectural inspections.

paid for all construction costs which he certified to be complete.

### (f) Difficulties Begin to Arise on Construction Job.

In July 1974, Green had occasion to first contact Randall Travis, Guaranty's vice-president, after being notified by a materialman that he had not been paid for materials which he delivered to the Grenada Shopping Center. In a telephone call, which Green placed during July or August 1974, he advised Travis about the filing of one lien and that he had information that other unpaid creditors had claims, yet unfiled, for materials and labor supplied to Watkins' shopping center project. Becoming concerned, Green talked not only to Randall Travis, but to Mr. French, Guaranty's president, as well as to Watkins. Green was informed by French that if Watkins was able to "get a few things corrected," ample money would be forthcoming to complete the job. In January 1975, Green again called Travis about further claims for unpaid labor and materials. On the occasion of these telephone calls Green testified that he was assured by Guaranty's vice-president that there *would* be ample funds to complete the job; moreover, that Travis advised him that he would soon come to Grenada to meet with Watkins' creditors and requested Green to notify all claimants to be present. Both Watkins and Travis were at the meeting, which was attended by numerous creditors. Neither Green nor his wife saw fit to attend. Travis contended, on the contrary, that at no time did he assure Green or anyone else that Guaranty would furnish funds necessary to complete the Grenada project. Instead, Travis testified that Watkins, who had become severely financially involved in various construction projects in several states, was seeking to obtain additional financing from Guaranty to cover all needs, including the Grenada project; that Watkins had first estimated his requirement to be $750,000 but this figure he later increased to $1,500,000. Watkins' request for additional funds was submitted to Guaranty's review committee, which had the authority—not Travis—to commit Guaranty. The review committee ultimately refused the additional request for funds.

Meanwhile, at the Grenada meeting with Watkins' creditors, Travis stated to those present that it would be in their interest to forebear filing suits or liens to see if Watkins could work out of his difficulties for it was only in that eventuality the unpaid creditors could hope to salvage what investment they had in the job. We note that no creditor appeared as a witness at the trial to dispute Travis' testimony to this effect. While Green and Mrs. Green both testified that Travis, in at least one telephone conversation, represented unconditionally that Guaranty would furnish funds to complete the job, this testimony was specifically denied by Travis. This court finds as a fact that Travis' version of the telephone conversation was true and consistent with what he had publicly told all creditors on the Grenada job, including the Greens. The Greens did testify that, despite their awareness of a considerable number of unpaid creditors and also that the shopping center was, in their opinion, far from completed, they "quit worrying" after talking to Travis, despite the fact that their personal credit had never been questioned in the Grenada community. The evidence shows that the Greens were content to leave it up to Watkins and to Guaranty to work out the problems in such manner as they could, and they were fully aware that their property was at risk in the event of Watkins' inability to obtain permanent financing.

After refusing further funds to Watkins, Guaranty took over the Grenada shopping center, hired certain of Watkins' employees, and performed further work on the project. By this time, of course, both major tenants—Magic Mart and Big Star—were open for operation. Grenada, including $5,000 paid upon the execution of the 25-year ground lease, received from Watkins only the first year's rent of $25,000. No further payments were made.

### (g) Foreclosure Proceedings.

On March 20, 1975, when Watkins was in substantial default upon his loan from

Guaranty, the latter retained counsel at Jackson, Mississippi, to foreclose the deed of trust on Grenada's fee interest as landowner, as well as Watkins' leasehold interest. Before any proceedings were commenced, however, Green was notified in writing by such counsel that the amount of the outstanding debt, both principal and interest as of February 28, 1975, was $1,155,579.05, with interest accruing daily at the rate of $338.75. A copy of this communication was sent to attorney Fedric; Green was invited to contact Guaranty's counsel. Neither Green nor his attorney responded to the letter.

Fedric advised Green that there was nothing Grenada could do to forestall the foreclosure unless it elected to assume or pay off Guaranty's indebtedness. Grenada thereupon discharged Fedric as its attorney and sought other legal counsel. Charles E. Gibson, Jackson attorney, was substituted as trustee in the deed of trust in the place of Randall Travis and directed by Guaranty to proceed with foreclosure in accordance with the provisions of the trust deed. Gibson notified both mortgagors—Watkins as well as Grenada—that foreclosure was imminent. Beginning September 3, 1975, Gibson, as substituted trustee, advertised notice of sale in the *Daily Sentinel Star,* a local newspaper published in Grenada County, for three consecutive weeks, and posted notice of sale on the bulletin board at the Grenada County courthouse, with sale set for September 25, 1975.

Although we have previously held, in granting summary judgment for Sevenprop, that Green and his attorney Fedric were both present at the sale and made no protest, Green on the witness stand denied this to be the case. It is immaterial whether Green was personally present; unquestionably he had notice of the public sale and opportunity to attend if he so desired. The only bid at the foreclosure sale was one made by Guaranty, the mortgagee, which had the right under the deed of trust to

become the purchaser at sale. Subsequently, Guaranty sold the property to Sevenprop for substantial value; and Sevenprop, upon taking immediate possession, made substantial repairs and additional improvements, unaware of any controversy existing between Grenada, Guaranty, or Watkins.[6]

### (h) *Status of Randall Travis.*

Randall Travis, in 1962, was first employed by Guaranty, beginning as a residential loan trainee. After being with that firm continuously for 13 years, he became vice-president in charge of the commercial loan department. He solicited Watkins as a customer. Mortgage banking, unlike commercial banking, is highly competitive business and is characterized by active solicitation for customers; such forms the basis of a successful mortgage banking business. Travis was paid a salary plus a commission of 25% on all fee-income generated by him over $50,000 annually for permanent financing cases. Watkins, as one of Guaranty's larger customers, was assiduously solicited by Travis for construction loan financing. Watkins presented to Guaranty a net worth of several million dollars; during the years 1971 through 1974, Guaranty had advanced construction money to him aggregating $38,000,000. Prior to 1974, Watkins had never been in default with any commitments with Guaranty, nor had he failed to pay his debts on the many construction jobs in which he and his firm had been involved with Guaranty. Travis regarded Watkins as a valued customer. However, Travis denied that Watkins had ever paid him a fee for services in obtaining temporary construction loans. On this point there was a sharp issue of fact, since Watkins testified that he paid Travis ¼ of 1% on all financing, including temporary construction money, obtained by Watkins through Guaranty. Travis stoutly denied that this was so, stating that his compensation for services on behalf of Guaranty was paid solely by Guaranty, and his commission from his employer—not Watkins—was based upon ¼ of

---

**6.** We have heretofore held in granting summary judgment for Sevenprop that Sevenprop was an innocent purchaser for value, thus acquiring

a valid title to the foreclosed property, including the fee interest held by Grenada.

the excess of $50,000 annually of fee-income generated to Guaranty for permanent financing on Watkins' projects. Moreover, Travis stated that if he was unable to obtain permanent financing, no commission would be paid to him by his employer. On this credibility issue, the court finds from the demeanor of Watkins and Travis on the witness stand that Travis was telling the truth, and Watkins, obviously mired in financial difficulties, was confused and had quite an inaccurate recollection of how Travis was compensated. The proof does show, as Travis readily admitted, that on three occasions, once in each year 1971, 1972, and 1973, he received from Watkins checks in the amount of $10,000 each near the close of each calendar year. These payments were for services which Travis had rendered to Watkins in assisting him in locating prospective commercial tenants and placing such firms in touch with Watkins in the development of Watkins' many commercial shopping centers. No payment, however, was received by Travis on any of the lessees which Watkins procured for the Grenada Shopping Center, since he, Travis, had made no contribution in procuring prospective tenants at that particular location. Moreover, there were no gifts, kickbacks, or other considerations of value paid by Watkins to Travis to cause the latter to be unfaithful to his employer, Guaranty, or to cause him not to exercise due prudence in dealing with Watkins' temporary construction loans. We attach no significance to Travis' occasional use of Watkins' airplane in company with prospective tenants for Watkins and other persons whom Watkins sought to entertain with an eye to pecuniary benefit to Watkins. Unquestionably, Watkins was himself a formidable promoter; he used all instrumentalities at his command to induce major chain stores to sign leases for spaces at construction projects which he was developing. Clearly, in this endeavor, Watkins achieved remarkable success for many years. Nevertheless, Watkins, whether due to factors within his control, or because of escalating inflation in building and labor costs in 1974 and thereafter, financially failed in all of his commercial ventures, including the Grenada shopping center, ended up in bankruptcy, with Guaranty and several other prominent mortgage bankers in the Mid-South area, holding temporary construction loans, being unable to obtain permanent financing with other institutions or lenders because of Watkins' bankruptcy proceeding.

Grenada, itself, had insufficient assets to assume, or purchase, Guaranty's position as mortgagee, prior to foreclosure, and no thought was given by Green and his wife to salvaging and completing the project, and thus protecting their 10-acre parcel of land worth $250,000. The evidence does suggest that the Greens, individually, had combined net worth adequate to finance the mortgage balance, but they were uninterested in using their personal credit to save the venture.

## II. LAW

Admittedly, this court has diversity jurisdiction under 28 U.S.C. § 1332, and the substantive law of Mississippi, since that jurisdiction represents the center of gravity of most contacts in this case, must govern the rights and obligations of all parties herein. It is familiar teaching that in a case of first impression, or where state law is unsettled, as to controlling principles, the federal courts must determine what would be the position taken by the Mississippi Supreme Court.

(a) *Liability.*

1. *Fraud.*

■ Grenada in Count II of its complaint alleges that Guaranty and Travis[7] are

---

7. Watkins and Sevenprop were originally included in the fraud count but both were subsequently dismissed from the action. See n. 1 and p. 1300. Watkins definitely represented to Grenada that, as part consideration for the 25 year ground lease, he would erect a shopping center on the leased premises with funds obtained from a $1,125,000 loan to be procured from Guaranty. Whether the other elements of fraud as to Watkins are present, and would constitute a debt not dischargeable in bankruptcy, 11 U.S.C. § 35(a)(2), as amended, Pub.L. 91–467 (Oct. 19, 1970), is not for the court's present determination, since Watkins is no longer a party.

jointly and severally liable to it on the ground of fraud and grossly negligent misconduct. Grenada contends that Guaranty and its agent, Travis, conspired with Watkins to defraud Grenada of its valuable realty. It is a well established principle of Mississippi jurisprudence that fraud must be established by clear and convincing evidence. In order to make out a case of fraud, there are nine elements which must be shown.

> To establish fraud, there must be a representation of the falsity thereof, the materiality of the false representations, the speaker's intent that it be acted on by the other in the anticipated manner, the hearer's ignorance of its falsity, his reliance on its truth, his right to rely thereon, and his consequent and proximate injury. See 37 C.J.S. Fraud § 2c(2).

*McMahon v. McMahon*, 247 Miss. 822, 157 So.2d 494, 501 (1963).

Plaintiff's evidence does not reveal that Guaranty and Travis, or either, made any representations of fact to Grenada, which proved to be false. The only representations of fact to Grenada were made by Watkins, whom Grenada has seen fit to dismiss from the case. See n. 6.

Indeed, there is a presumption against fraud, the Mississippi Court stating that it is "not a thing to be lightly charged and most emphatically not a thing to be lightly established. A mere preponderance is not sufficient to establish fraud; . . ." *Jones v. Minton*, 244 Miss. 354, 141 So.2d 564, 565 (1962). Moreover, "it is not a fraud or unlawful to do what one has a legal right to do." *Mississippi Power & Light Co. v. Town of Coldwater*, 234 Miss. 615, 106 So.2d 375, 381 (1958), citing *State v. Wilbe Lumber Co.*, 217 Miss. 346, 64 So.2d 327 (1953).

In the case sub judice, Grenada has utterly failed to establish, by clear and convincing evidence, fraud, or a conspiracy to commit fraud on the part of Guaranty, Travis and Sevenprop. Although Grenada lost valuable real estate, the evidence is quite plain that Guaranty was, in its dealings with Watkins, involved to its financial detriment when Watkins encountered extensive financial difficulties, and Guaranty had sustained substantial losses in the recovery of money which it advanced to construct the Grenada Shopping Center. Travis, in no way, did profit, either individually or as trustee in the deed of trust, from his connection with the project. We are unable to perceive that Travis could be considered a party to any wrong worked upon Grenada, or its shareholders. Instead of profiting from Watkins' development at Grenada, Travis was unable to bring the venture to a state of completion so that permanent financing therefor could be obtained. Only in that case would Travis have stood to have been paid a commission by Guaranty, and not by Watkins. Innuendoes and suspicions which counsel for plaintiff seek to cast upon Travis as one dominated or ruled by Watkins are without substance; they are not a substitute for evidence, or reasonable inferences. Grenada's case based upon conspiracy and fraud completely fails as to all parties.

### 2. *No Action Against Hart-Freeland-Roberts, Inc.*

■ Grenada, in Counts I and III, charged that Hart-Freeland-Roberts, Inc., architect-engineers, were concurrently negligent with other defendants in the case, and their breach of duty proximately caused damages to Grenada. As heretofore found, the only contract made by the Hart firm was with Watkins; it was of a limited nature—not to draw plans and specifications, nor to undertake full supervision over the Grenada Shopping Center during the course of construction—but only to perform limited periodic inspections as to the percentage of completion, including materials on hand as well as in place, each time that Watkins wished to procure a draw against the temporary construction loan. The architect-engineers had no contractual rela-

1310

tions with Grenada, nor during the course of the work did they, or their agent, Petty, have any contact with Grenada or the Greens. Granting that the architect-engineers may be liable to third parties foreseeably relying thereon for negligent breach of professional duty and proximately causing economic loss, *Owen v. Dodd*, 431 F.Supp. 1239, 1242 (N.D.Miss.1977); *Engle Acoustic & Tile, Inc. v. Grenfell*, 223 So.2d 613 (Miss. 1969), and that privity between the injured party and the architect-engineers is, by statute, no longer a prerequisite for liability, Miss.Code Ann. § 11–7–30 (Supp.1978), the weight of the evidence shows that Petty, as agent of the architectural firm, did perform inspection work contracted for with reasonable proficiency; that it was proper for the firm to regard as a "contract" Watkins' underlying cost estimate submitted to Guaranty inasmuch as Watkins was to do his own construction work, using only subcontractors. There is no evidence that the percentages arrived at by Petty were not in accordance with reasonably accurate professional judgment. Indeed, the proof shows that at the conclusion of Petty's several inspections ending in November 1974, Magic Mart and the small mall area were 100% complete, Big Star Grocery was likewise 100% complete, and the remaining large mall area 97% complete. There is no evidence to contradict that the value of the improvements in place, apart from the land, was different from or less than the sum of $1,008,380 as certified to by Petty. Moreover, there is no evidence that Petty, as agent of the architectural firm, was aware of any unpaid materialmen and laborers; he, in fact, was unaware of the total amount of Watkins' construction loan for the Grenada project. We therefore find that Grenada has failed to show any negligent performance of professional duty of the architect-engineers arising from their contractual obligations to make limited, periodic inspections.

### 3. No Action Against Travis.

■ Grenada contends that Travis was under the domination of Watkins and acquiesced in his wishes, irrespective of

knowledge that the shopping center was not being constructed with funds obtained under Guaranty's construction loan. Grenada insinuates that Travis was being compensated by Watkins, and unfaithful to his employer, and that it took Travis' cooperation with Watkins for the latter to obtain Guaranty's funds in a manner prejudicial to Grenada's interest as subordinated owner of the construction site. We have decided the credibility issue between Watkins and Travis in favor of the latter, and hold that he was in no way paid by Watkins for procuring partial draws against the construction fund loan, or that Travis was guilty of disloyalty to his employer. The truth of the matter is that the only compensation which Watkins ever paid to Travis was for wholly unrelated services performed by Travis in locating for Watkins prospective tenants for his various shopping centers. For this, Travis did receive three payments of about $10,000 each over a three-year period, but he received no payment whatever in connection with tenants entering the Grenada Shopping Center. We, of course, agree that Travis was under a duty not only to be faithful to his employer but to act as a reasonably prudent banker with his customer Watkins and with due regard for the interests of Grenada, the substantial owner of property on which his customer, Watkins, proposed to erect a shopping center and against which his employee, Guaranty, held a first mortgage securing the temporary construction loan. Grenada, however, has failed to present any substantial, or credible, evidence that Travis was negligent in any respect, or guilty of any disloyalty, or was a party to any collusive arrangement with Watkins which prejudiced either Grenada or Guaranty. We therefore hold that no liability has been shown against Travis, either individually or as trustee in Guaranty's deed of trust.

### 4. No Action Against Guaranty.

The remaining issue in the case relates to whether Grenada has a cause of action against Guaranty. This emerges as the dominant legal question for us to decide

under the particular facts and circumstances of this case. Since Mississippi has no case in point, it becomes necessary that we examine relevant decisions of the State Supreme Court as well as the state of the law in other jurisdictions on facts analogous to those here presented.

Mississippi has had a long-standing statutory policy of protecting any person who furnishes material or labor in the erection of any structure, through a procedure for binding funds in the hands of the owner where the contractor or master workman fails to pay for the material used, or labor performed, in such construction; this binding is accomplished by the unpaid materialman or mechanic giving written notice to the owner of his outstanding claim. Miss. Code Ann. § 85–7–181 (1972) (This statute first appeared in the Mississippi Code of 1880.). The unpaid claimant is thereby granted a statutory method for insuring the collection of his claim, so long as funds remain in the owner's hands—and such claim has priority over any balance due the general contractor. Moreover, this priority position is further protected against subsequent purchasers or encumbrancers for value when the unpaid materialman or laborer files his claim upon the lis pendens record maintained in the office of the chancery clerk of the county where the improved realty is located. § 85–7–197. These statutory rights did not exist at common law, and without them, materialmen and laborers would merely be general creditors of the contractor. *Chancellor v. Melvin*, 211 Miss. 590, 52 So.2d 360 (1951). The sections have been strictly construed. For example, the right to acquire such liens extends only to persons engaged by the original contractor, and not to those supplying materials or labor at the request of a subcontractor. *Monroe Banking & Trust Co. v. Allen*, 286 F.Supp. 201 (N.D.Miss.1968); *Lake v. Brannin*, 90 Miss. 737, 44 So. 65 (1907). See 53 Am.Jur.2d, *Mechanic's Liens* § 168 at 683–85 (1970). Mississippi cases have clearly settled the conditions for priority of claims as between mortgage lenders of construction funds and materialmen or laborers engaged by the owner or his contractor. The

maxim that first in time of recording primes the lender's deed of trust or mortgage does not necessarily control when a subsequent lien is asserted by a materialman or laborer. The landmark decision in this field is *First National Bank of Greenville v. Virden*, 208 Miss. 679, 45 So.2d 268 (1950), which squarely presented the issue of priority between the lien of a statutory claimant for material and the mortgage lien of a bank advancing funds to Hilliard, the property owner, to erect thereon two houses. The bank placed the loan in a suspense account for release to Hilliard at intervals, but did not supervise the expenditures, made no request of Hilliard for paid invoices, and simply accepted the borrower's word that the funds were going into the construction. The bank held a deed of trust for $11,200, which was recorded August 9, 1947, and had no notice of the materialman's claim for $4,307.18. The court, upon the sale of the houses, awarded the bank priority for $7,315.76, the amount of the advances by the bank shown to have been used to purchase the lots and construct the houses, but granted priority to the materialman for its entire claim of $4,307.18. In so holding, the Court said:

> The mortgagee, in a case such as this, should advance the proceeds with reasonable diligence in order that the *holders of statutory liens* may not be unjustly defeated in their claims. It is simple justice that such mortgagee [nevertheless] shall have preference *only to the extent that its funds actually went into the construction.* 45 So.2d 270–271. (Our emphasis).

This holding was followed in *Deposit Guaranty Bank & Trust Co. v. J. F. Weaver Lbr. Co.*, 215 Miss. 183, 60 So.2d 598 (1952).

The "simple justice" rule, above alluded to, was qualified for the benefit of construction lenders in *Wortman & Mann, Inc. v. Frierson Building Supply Co.*, 184 So.2d 857 (Miss.1966), when the Court held: "It is only necessary for the mortgagee to show reasonable diligence to see that [its] funds are used in the construction of the building." at 860. The Court in *Wortman and Mann* found that the title company required

the furnishing of an owner's affidavit that he did not owe for materials and labor at the time of any advance, and attorneys made regular trips to the chancery clerk's office to ascertain if any claimant had perfected his claim by filing notice thereof, and ruled that the construction lender's lien was prior to that of materialmen who had omitted filing claims on the lis pendens record or the instituting of suit until after the mortgage lender disbursed all funds to its borrower, Alton W. Ivey.

It is well established law in Mississippi that the construction lender will be protected in the priority of its recorded mortgage against an unpaid materialman or laborer where the former exercises reasonable diligence to see that the funds are actually used to defray construction costs, *Southern Life Ins. Co. v. Pollard Appliance Co.*, 247 Miss. 211, 150 So.2d 416 (1963), but loses that priority, to the extent that loaned funds are diverted from the work, when failing to discharge its duty in disbursing loan proceeds, *Cook v. Citizens Savings & Loan Ass'n*, 346 So.2d 370 (Miss.1977). The "reasonable standard of care" test was only recently applied by the State Supreme Court in *North American Mortgage Investors v. Mississippi Hardware Co., Inc.*, 360 So.2d 1203 (Miss.1978).

Grenada contends that, although it is neither a materialman nor laborer, it is entitled to the especial protection of the courts since it subordinated its fee interest in the land to a construction lender's mortgage for the sole purpose of having a commercial shopping center erected on the subordinated property by its ground lessee, Watkins. Grenada urges that it is entitled to priority over Guaranty's mortgage lien on two alternative grounds: (1) that the understanding of the parties—Grenada in executing a ground lease to Watkins and in agreeing to subordinate its fee simple title to a construction loan, Watkins in representing that he would erect on the leased premises a commercial shopping center, and Guaranty, the mortgage banker, in agreeing to advance $1,125,000 to construct the shopping center—created an implied contractual duty on the part of Guaranty to Grenada for the

successful fruition of the project; and that Guaranty's failure to maintain adequate safeguards to insure that periodic advances of construction funds to Watkins were used only for the project, constituted negligent breach of such duty causing Grenada not only to lose its valuable real estate but to be deprived of the longterm benefits accruing from the 25-year ground lease; and (2) that Grenada's relationship to the project, i.e., subordinating landowner vis-a-vis a mortgage lender dealing with a commercial developer, over neither of which Grenada had supervision or control, calls for the imposition of equitable duties on the construction lender to avoid manifest injury to Grenada. Finding both of these contentions to be without merit, we will undertake to give such discussion as may be proper in view of the fact that this issue is one of first impression in Mississippi.

As for any duty based upon contract, it should be pointed out initially that neither the ground lease nor the deed of trust which Grenada signed contained any protective clauses to insure that the loan proceeds would be used for the construction of the shopping center, nor did they contain any safeguards or restrictions on the manner of distribution or expenditure of the advances. Indeed, the documents which Grenada signed, after consulting with its own attorney, neither specified the size of the shopping center, nor the nature or quality of the buildings to be contained therein. Furthermore, these documents did not require that the shopping center structures be designed by an architect whose plans and specifications would form the basis for Guaranty's advances and which would be subject to Grenada's approval. The only conclusion which we can reasonably draw from these notable omissions is that Grenada was primarily concerned with obtaining a 25-year ground lease producing an annual rent of $25,000, or 10% of the net investment in the real estate which Green in 1973 valued at $250,000; Grenada and its officers obviously regarded Watkins as not only a person of large net worth, capable of meeting his financial commitments but also as an expe-

rienced shopping center developer in whom they had full confidence. There can be no other explanation for Grenada's omission of specific standard protective clauses designed to assure it, as the landowner, that Watkins' representations, through the use of borrowed money, would be carried out in an arms-length transaction between an owner of a valuable piece of unencumbered real estate and its lessee-developer.

■ The general rule throughout the United States is that where a landowner agrees to subordinate his fee interest to a mortgage lien for the purposes of obtaining a construction loan, without an express covenant from the mortgagee (or lessee-developer) to the landowner, to see to the application of the sums advanced, possible diversion of funds by the mortgagor-developer is a risk assumed by the landowner, unless the latter is able to demonstrate fraud or collusion between the mortgagor-developer and the mortgagee. *Gill v. Mission Savings & Loan Ass'n,* 236 Cal.App.2d 753, 46 Cal. Rptr. 456 (D.C.App.1965); *Iowa Loan & Trust Co. v. Plewe,* 202 Iowa 70, 209 N.W. 399 (1926); *Cambridge Acceptance Corp. v. Hockstein,* 102 N.J.Super. 435, 246 A.2d 138 (1968); *Kennedy v. Betts,* 33 Md.App. 258, 364 A.2d 74 (Md.Ct.Spec.App.1976); *Forest, Inc. of Knoxville v. Guaranty Mortgage Co., Inc.,* 534 S.W.2d 853 (Tenn.Ct.App.1975); *Drobnick v. Western Federal Savings & Loan Ass'n,* 479 P.2d 393 (Colo.Ct.App. 1970). The obvious rationale for this rule is that when parties see fit to enter into contractual arrangements, their rights and obligations are to be measured by the terms thereof, without help or assistance from courts in adding to the agreement clauses which it would have been wise or useful to have employed in the first instance.

In the case sub judice, there is, as previously found, an absence of any proof of fraud or collusion between Guaranty, Travis or Watkins. Moreover, there was no express contractual duty upon Guaranty to erect safeguards of any kind for the release of funds to Watkins in the construction of the shopping center. Of course, had Watkins used none of the loan funds at the Grenada site and had Guaranty been aware of such diversion, that would constitute fraud or collusion justifying a court in invalidating both the ground lease and the subordination executed by the landowner. The evidence in this case compels an entirely different conclusion for, as we have already found, all of the funds advanced to Watkins were used in the shopping center, even though they proved to be insufficient to complete the project.

■ Grenada, despite the absence of any express contractual provision, nevertheless argues that there was an implied duty on the party of Guaranty to establish proper safeguards to assure that the construction funds would go into the project; in advancing this argument, Grenada necessarily assumes that a substantial part of the loan funds were diverted to other purposes. In support of this contention, Grenada asserts not only the rationale of the Mississippi mechanics' lien decisions, see, e. g., *Cook v. Citizens Savings & Loan Association, supra; First Nat'l Bank of Greenville v. Virden, supra,* but also seeks comfort in decisions from other jurisdictions which have specifically addressed the issue of whether, and if so, to what extent a duty is owed by a construction lender to an injured subordinating landowner. As to the latter, Grenada places particular reliance upon *Middlebrook-Anderson Co. v. Southwest S.&L. Ass'n,* 18 Cal.App.3d 1023, 96 Cal.Rptr. 338, wherein the California Court departed from the generally established rule in recognizing that equity will raise an implied agreement in proper circumstances for the benefit of a subordinating landowner. Grenada refers specifically to the following language of the California Court in describing the basis for and nature of the duties arising from such agreement:

[A]s between the seller and the lender, the lender is in by far the better position to control the use of the loan proceeds and thereby prevent misappropriations by the developer. The lender can require documented evidence that expenses have been incurred and can corroborate this by on site inspection. . . . Here, it is

alleged the lender, with full knowledge of the subordinated lien of the seller, disbursed the funds *without limitation*. Its disinterest in the application of the *funds not used for the construction* amounted to a failure to prevent the loss sustained by the seller—who, in the vernacular of the market place, was "wiped out."

96 Cal.Rptr. at 346–47 (Emphasis added). Thus, by comparison with our foregoing analysis of Mississippi cases, it is readily apparent that the rationale of the above quoted California decision is congruent with the "simple justice" rule first announced in *Virden* by the Mississippi Supreme Court in connection with mechanics' and materialmen's liens, i. e., when the lender fails to use reasonable diligence to insure that loan funds are used for the construction for which the loan is made, such lender will be preferred *only* to the extent that such funds actually go into the construction.

This conclusion is buttressed by the fact that the Court in *Middlebrook* also stated:

An implied agreement in the instant case can and, in equity, should be spelled out from the lender's alleged actual knowledge of the provisions of the seller's lien in general, and of the subordination therein in particular. In the superior position of a financial institution constantly engaged in professional construction lending [it] had no reason to believe [its] trust deed conferred any lien to which the fee was subordinate *other than to the extent of money spent for construction purposes.*

96 Cal.Rptr. at 347. (Emphasis added). Thus, even under *Middlebrook's* acknowledgment of an implied contractual duty upon the mortgage-lender to supervise the expenditure of money lent, the subordinating landowner is granted only the degree of priority accorded an unpaid materialman in Mississippi and therefore is entitled to recover only those amounts advanced which were diverted from the construction project.

In our opinion, the Mississippi Supreme Court, if faced with the question before us, would adopt the majority rule prevailing in the United States to the effect that, absent express clauses in the loan documents directing or restricting the use of construction funds to a particular project, the subordinating landowner bears the risk of diversion by a developer who obtains a mortgage to finance improvements, unless the landowner can show fraud, collusion or other inequitable conduct participated in by the mortgagee and the mortgagor-developer. We hold to this view because the Mississippi Court, since *Wortman & Mann* was decided in 1966, has consistently followed what may fairly be regarded as a conservative view in supporting the priority of mortgagees who exercise ordinary care in the disbursement of their funds, even against the claims of unpaid materialmen or laborers—claimants who stand upon a much higher plane than would the subordinated landowner who contributes no materials or efforts to the construction job, and who has at his disposal a means for protecting his interests in any commercial venture by insisting upon the inclusion of protective language in the documents comprising the agreement. Secondly, the *Middlebrook* case, upon which plaintiff principally relies, is based upon a California statute, and the Court's analysis thereof, which makes subordinating agreements that contain no restrictive clauses unenforceable. See *Middlebrook, supra,* 96 Cal.Rptr. at 347. There is no such statutory counterpart in Mississippi to justify judicial invalidation of an otherwise valid contractual provision.

Even assuming that Mississippi would adopt the view that under some circumstances an implied duty would be placed upon a construction lender, with knowledge of the owner's subordination, to adopt proper safeguards to insure that the funds went into a construction project, the overwhelming proof in this case is that Guaranty exercised ordinary care in the disbursement of funds to Watkins by the adoption of the methods heretofore discussed: requiring a certificate of inspection by an independent firm of architects; requiring an owner's affidavit stating the degree of completion of the various phases of each aspect of the project; obtaining an affidavit from the

title company that all construction costs had been paid; and having an attorney regularly search the records to ascertain the existence of any materialmen or mechanics' liens on file at the time of each advance. It is significant to note that such actions are not only clearly sufficient to constitute reasonable diligence on the part of the mortgagee in Mississippi where the statutorily favored liens of unpaid materialmen and laborers are involved, see, e. g., *North American Mortgage Investors, supra,* but also would be, under the *Middlebrook* decision, determinative of the issue of whether the mortgagee has complied with the equitable duty imposed therein for the subordinating landowner's benefit. See 96 Cal.Rptr. at 346–47.

Therefore, if the evidence conclusively showed compliance with the above noted procedures with respect to every advance, then Grenada would clearly be entitled to no relief under either theory.

■ Grenada contends, however, that by analogizing its position to that of an unpaid materialman who gives the statutorily required notice of his claim, Green placed Guaranty on notice that there were outstanding, unpaid materialmen and laborers in July 1974, thus requiring Guaranty to make certain that any subsequent advances went to pay such creditors. Additionally, the record does show that Guaranty's later advance of $175,157 was made without previously obtaining an attorney's updated title certificate; however, as of the date of that advance, no materialman or mechanic's lien had been filed so that examination of the land records would have revealed no additional facts that Guaranty, in the exercise of ordinary care, could have ascertained. Moreover, even if Grenada, as subordinating landowner, is placed in a position analogous to that of an unpaid materialman in Mississippi by virtue of (1) oral notice to Guaranty's representative in July 1974 of the existence of unpaid, but unfiled, claims; and (2) Guaranty's failure to do anything but advance the full amount, under the settled principles of Mississippi law relative to materialmen's liens, as well as

under *Middlebrook,* Guaranty would be denied priority *only* to the extent that amounts advanced did not actually go into the construction project. See *Virden, supra*; *Middlebrook,* 96 Cal.Rptr. at 347.

From the preponderance of credible evidence presented at trial, we have found that as of November 4, 1974, the value of the completed improvements on Grenada's land was $1,008,380, and that there were outstanding claims of $130,000 which were subsequently paid by Guaranty. The record further shows that by November 1974 Guaranty had advanced $1,090,115, which amount is $48,265 less than the value of the completed improvements, plus the total of unpaid claims existing at that time; in other words, as we have found in part I(d) of this opinion, Grenada totally failed to show that any funds advanced by Guaranty were diverted by Watkins from the Grenada project, and that the cost overrun of $114,-998 resulted from an unexpectedly high rate of inflation in prices for materials and labor. Thus, even if Guaranty's action after oral notice from Green constitutes negligence, Grenada has no claim for relief since no diversion was shown.

■ We are equally unpersuaded by Grenada's argument that equitable principles require that Guaranty be held liable for injury to Grenada. From the whole record, it clearly appears that both Grenada and Guaranty justifiably relied upon Watkins' successful experience as a commercial developer, as well as his financial worth; that neither could have foreseen the unprecedented, rapid increase in the costs of materials and labor in 1973–74 which provided the impetus for Watkins' financial collapse. Additionally, Grenada, from the beginning, could have contractually protected itself against the collapse which ultimately occurred.

Finally, we are of the firm opinion that the sequence of events occurring from mid-July 1974 through the foreclosure sale required Grenada to do more than simply "not worry." Grenada had it within its power to take affirmative action to avoid foreclosure and take proper steps calculated

to retain its valuable real estate and the commercial development erected thereon. By so doing, Grenada could have avoided the substantial, total loss which it has sustained.

For the foregoing reasons we are of the opinion that Grenada has no claim for relief and its complaint should be dismissed with prejudice.

Let an order be entered accordingly.