430 A.2d 1173

CONSHOHOCKEN FEDERAL SAVINGS AND
LOAN ASSOCIATION,

v.

PERIOD AND COUNTRY HOMES, INC.

Appeal of GENERAL DEVELOPMENT CORPORATION.

Superior Court of Pennsylvania.

Argued June 10, 1980.

Filed June 12, 1981.

Stuart N. Cohen, King of Prussia, for appellant.

James J. Garrity, Norristown, for appellee.

Before HESTER, CAVANAUGH and VAN der VOORT, JJ.

CAVANAUGH, Judge:

The proceedings in the lower court in this case were on exceptions to a sheriff's schedule of proposed distribution. The schedule was filed following execution of a writ by the Sheriff of Chester County. Exceptions were filed by the appellant pursuant to Pa.R.C.P. 3136. The writ of execution was filed by the plaintiff in the court below, Conshohocken Federal Savings and Loan Association, against the property of the defendant, Period & Country Homes, Inc. Following a hearing before Judge Thomas A. Pitt, Jr., the exceptions were dismissed. The exceptant has appealed from the order of dismissal.

The facts in this case are complex, but basically are not in dispute. In May and November, 1974, General Development Corporation sold three lots to Period & Country Homes, Inc. (hereinafter called P. & C. Homes) and took back three purchase money mortgages to secure indebtedness in the total amount of $30,000.00. Two new homes were to be built on the lots by P. & C. Homes. Prior to the recording of the purchase money mortgages given to General Development, Conshohocken Federal Savings and Loan Association (hereinafter called ConFed) loaned P. & C. Homes $276,-000.00 for the construction of the two homes. The three lots

involved were lots No. 28 and 29 Wyllpen Drive on which one house was to be built and No. 48 Hunter Circle on which another house was to be constructed. General Development, whose president was Richard Dilsheimer, was the developer of Wyllpen Farms, a subdivision in Chester County, and P. & C. Homes, whose president was Charles E. Pusey, was one of several builders who were constructing homes at Wyllpen Farms. As work progressed by P. & C. Homes it became clear that the original loan to it by ConFed would be insufficient to complete the homes. By December, 1975, it became necessary for ConFed to inject additional funds into the financially ailing P. & C. Homes. On December 24, 1975, three interrelated contracts were signed, although not necessarily involving the same parties, as follows: (1) a construction loan agreement between ConFed and P. & C. Homes; (2) a construction agreement between Homes & Homesteads, Inc. and P. & C. Homes; and (3) a subordination agreement postponing mortgages entered into between General Development, ConFed and P. & C. Homes.

Under the construction loan agreement ConFed loaned P. & C. Homes $70,400.00 secured by a mortgage on the three lots sold by General Development to P. & C. Homes, which were already subject to the purchase money mortgage from P. & C. Homes to General Development. The purpose of the $70,400.00 construction loan was to put the two homes under construction in such a state that buyers could be found for them. Under the construction loan agreement, P. & C. Homes was referred to as "owner" and ConFed was referred to as "lender." The agreement provided as follows in Section 15(G):

(G) That the Lender shall assume no liability whatsoever to the Owner, his contractors, sub-contractors and materialmen, or others, except for its malfeasance in the application of the said funds for the purpose hereinbefore recited and shall be fully protected in making any payment upon the faith of any requisition, *inspector's certificate or* release of lien or other instrument, believed by it to be genuine and to have been duly executed by the

proper parties, and the Owner does hereby release and discharge the Lender of and from any such liability and hereby further agrees to indemnify and save harmless the said Lender of and from any and all liability, damages, costs and expenses which it may sustain by reason of its application of said funds in good faith for the purposes hereinbefore set forth.

The second agreement entered on December 24, 1975, was the construction agreement between Homes & Homesteads, Inc. and P. & C. Homes. Mr. Pusey was the president of Homes & Homesteads, Inc. as well as being president of P. & C. Homes. It is interesting to note that although the construction agreement was entered into between two separate corporations, Charles E. Pusey signed as both president and secretary of Homes & Homesteads, Inc. and also signed as president and secretary of P. & C. Homes. This agreement stated that Homes & Homesteads, Inc. (referred to as contractor in the agreement) was to provide labor and material on the homes being built on lots 28 and 29 and lot 48 which were owned by P. & C. Homes and referred to in the agreement as "owner." ConFed was not a signatory to this agreement but it was stated that it was understood that ConFed, designated as "Lender" in the agreement "has lent the Owner a certain sum of money secured by a first mortgage on the property above described... It is expressly understood, however, that the Lender is not the Agent of either the Owner or Contractor, and shall in no event be held liable for any neglect, omission, default, or breach on the part of the Owner or Contractor." Article IX of this agreement also provided as follows:

It is further understood... that the Lender [has] in its possession... the total amount of ... $70,400.00 which shall be held by the Lender and applied to the contract price above set forth, which sum shall be paid by the Lender directly to those furnishing labor and/or materials, as the case may be, in accordance with a table of payments which shall be filed with the Lender by the Contractor, based substantially on the following schedule: On

Friday of each week beginning one week after commencement of work, Contractor shall submit to owner a voucher for 90% of the value, based on invoice or contract prices of labor and materials incorporated in the structure and of materials delivered to the site of the work, less the aggregate of previous payments, which voucher, when approved by Owner shall be paid within ten days after; and final payment of the contract price within one month after the full completion of the work, upon presentation of a voucher by Contractor to owner certifying completion and on delivery of a full and complete Release of Liens duly executed by the Contractor and all sub-contractors and materialmen, at which time Owner agrees to sign a certificate of completion.

The third agreement entered into on December 24, 1975, was the subordination agreement between General Development, ConFed and P. & C. Homes. The agreement stated that P. & C. Homes was the owner of lots 28, 29 and 48. The agreement further acknowledged that General Development was the owner and holder of three mortgages on the lots which have been duly recorded in the office of the Recorder of Deeds of Chester County. The subordination agreement further provided that:

1. [General Development Corporation] agrees that the mortgages given to it by Period and Country Homes, Inc. dated (1) May 20, 1974 and in the sum of $15,000.00 and (2) dated May 20, 1974 in the sum of $15,000.00; and (3) dated November 4, 1974 in the sum of $30,000.00 and which mortgages are recorded... in Chester County Recorders office, West Chester, Pennsylvania be and the same is [sic] hereby postponed in lien, priority, operation, payment and distribution upon any judicial sale of the above described premises and subject and subordinate in lien to the lien of the mortgages given by Period & Country Homes, Inc. to Conshohocken Federal Savings and Loan Association dated December 24, 1975, in the sum of seventy thousand four hundred dollars ($70,400.00) which mortgage is recorded in Chester County records [sic] at West Chester, Pennsylvania...

2. [General Development Corporation] hereby agrees that the postponement of said mortgages, given to it by [Period & Country Homes] to the lien of the mortgage given by [Period & Country Homes] to Conshohocken Federal Savings and Loan Association] shall have the same force and effect as though the said mortgage given to Conshohocken Federal Savings and Loan Association by [Period and Country Homes] on December 24th, A.D. 1975 had been executed, delivered, and recorded prior to the execution, delivery and recording of the mortgage given by [Period and Country Homes] to [General Development Corporation] (1) on May 20, 1974, (2) on May 20, 1974 and (3) on November 4, 1974.

3. [General Development Corporation] agrees that in the event of any foreclosure proceedings brought by it or its successors and assigns against the aforesaid above described premises, whether said foreclosure proceedings are commenced on the Bond, Note or the Mortgage, that the judicial sale in connection with such foreclosure proceedings shall not discharge the lien of the mortgage given by [Period and Country Homes] to [Conshohocken Federal Savings and Loan Association] on December 24, 1975, any statute or rule of law to the contrary notwithstanding.

At or about the time the construction loan was entered P. & C. Homes prepared "schedules of operations" on a form supplied by ConFed. One schedule of operations relating to lots 28 and 29 Wyllpen Drive and one to lot 48 Hunter Circle. The schedules of operations are unsigned and undated and were never made part of any of the agreements entered into by various parties to this dispute. The schedules of operation listed the work to be done on the houses and estimated costs.

In order to understand the various written documents it is necessary to consider the factual background pertaining to the corporations involved. General Development sold the three lots in question to P. & C. Homes so that two homes could be built on the three lots. The homes were to be

expensive and were to sell at prices in excess of $150,000.00 each. As mentioned previously, the $276,000.00 originally loaned by ConFed to P. & C. Homes was insufficient to complete the homes. In August, 1975, Mr. Pusey, President of P. & C. Homes, wrote to Richard Dilsheimer, President of General Development Corporation, with a copy to Mr. Gunning, who was at that time the President of ConFed, with reference to additional funds that Pusey needed to complete the homes. Mr. Pusey stated "Lately, with an improved market I have surprising interest—but frankly, I need the additional funds to get into suitable presentation conditions. It is difficult to appreciate the present costly structure, until the further work brings out all the beauty (like herbs in gourmet food) ... In any event it is to the interest of all parties and to the increasing value of Wyllpen ground to get this financing settled at once and get on with the presentation."

On September 19, 1975, Mr. Gunning, wrote to Richard Dilsheimer, with a copy to Mr. Pusey:

Mr. Pusey and I got together today on other matters and the question came up of the additional funds that he needs to complete the two houses. I told him that I was in the process of getting the vouchers together for you to look at and he found that very objectionable. He at this stage feels that somebody thinks that he's been stealing money or cheating and doing the improper thing...

The entire subject he feels is irrelevant to the fact and we must consider the situation from the facts that we have at hand. We have a decision to make, either give him the opportunity to proceed and complete the properties or we take alternate means.

I think we should look at the matter sensibly and realize the position we find ourselves in and allow the man to express himself and move ahead to get the properties completed. I think a completed property is what we'd all like to have more so than what we have now.

Mr. Dilsheimer testified that Mr. Pusey needed about $130,000.00 to complete the houses and that the $70,400.00

that was loaned to him by ConFed was only going to put the houses in condition so that they could be sold. On September 29, 1975, Richard Dilsheimer wrote to Mr. Gunning and stated that he had decided "to accommodate your's and Mr. Pusey's request to subordinate our $30,000.00 mortgage to your additional $70,000 construction loan thru September, 1976." He further stated, "George, we are making this accommodation on your promise that voucher payments on the $70,000 will be carefully controlled and before payment is made, your bank will inspect and approve the work. I still find it difficult to understand how Mr. Pusey could have put almost $250,000 into the two houses (exclusive of land). I will look forward to the opportunity of taking you to the site and showing you the houses we have built for 65% less and perhaps then you will share my bewilderment and concern."

General Development did not enter the subordination agreement lightly or without understanding of what it was doing. It was owed money by P. & C. Homes and saw little chance of getting its money unless the two homes could be put into a condition to be sold. To do this more money would have to be put into P. & C. Homes and the sources of the funds was to be ConFed. Mr. Dilsheimer was aware that Mr. Pusey did not spare expenses in the homes that he built and apparently Mr. Dilsheimer felt that he could have built the same quality homes as Mr. Pusey at a much lower price. Nevertheless, in an attempt to salvage his own situation he was willing to subordinate General Development's purchase money mortgages so that ConFed would loan $70,400.00 to P. & C. Homes. As events turned out the $70,400.00 was not enough money to save P. & C. Homes and its ultimate collapse has resulted in a financial loss to General Development.

P. & C. Homes defaulted on its obligation to ConFed and mortgage foreclosure proceedings were commenced by ConFed against its mortgagor. The sheriff of Chester County sold P. & C. Homes' three lots at sheriff's sale pursuant to a writ of execution and ConFed was the purchaser at the sale. General Development filed exceptions to

the sheriff's schedule of proposed distribution. By agreement of the parties, ConFed deposited $34,000.00 with the sheriff of Chester County, representing the unpaid balance claimed by General Development on account of its mortgage liens to be held pending determination of General Development's exceptions. After hearing, the court below dismissed the exceptions and in effect denied General Development's claim to any of the funds being held by the sheriff.

Basically, General Development contends that ConFed did not follow the schedule of operations in disbursing funds to Homes & Homesteads, Inc. Appellant contends that ConFed made non-obligatory advances which did not contribute to the value of the properties and that therefore its lien as to such advances would not take priority over General Development's lien under the purchase money mortgages.

A cardinal rule of the interpretation of contracts is that the intent of the parties at the time the contract is entered is controlling. *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3rd Cir. 1979). When the language of a contract is clear and unambiguous, the intent of the parties is to be determined only from the express language of the agreement. *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 302 A.2d 347 (1973). Appellant relies on *Housing Mortgage Corp. v. Allied Construction, Inc.,* 374 Pa. 312, 97 A.2d 802 (1953) in which the sole question involved was the relative priority of the liens of a purchase money mortgage and a construction mortgage. In the *Housing Mortgage Corporation* case the owner of several lots agreed to sell them to Allied Communities, Inc. which assigned the agreement to Allied Construction Company, Inc. The seller agreed to take back a purchase money mortgage. On the same date as the signing of the purchase money mortgage, construction loan agreements were entered into between Allied Construction and Housing Mortgage Corporation. The purchase money mortgage provided that the lien of the mortgage was "postponed and made junior in lien..." to the construction mortgages executed on the same date. The construction loans provided for a schedule of amounts which were to be

advanced by Housing Mortgage Corporation to Allied at various stages in the construction of the dwellings. The schedule was very specific and provided as follows:

(a) no immediate payment; (b) a certain specified sum when the foundation of each house was completed and the first floor joints were in place; (c) a certain specified sum when the shell of each house was erected and the roof installed; (d) a certain specified sum when the brick or stone veneer front and all siding had been applied to each house, chimneys erected, door and window frames set, prime coated; (e) a certain specified sum when the plumbing of each house had been installed, wiring roughed in; furnace roughed in; (f) a certain specified sum when each house had the plaster completed; basement floor in; windows and exterior doors hung; (g) a certain specified sum when each house had been trimmed, the doors in; floors completed, hardware in; painting completed; ready for final FHA inspection. It was provided that these payments were to be made only if and when the various stages of work were completed to the satisfaction of the mortgagee.

374 Pa. at 315, 316, 97 A.2d at 803.

As work progressed, from time to time Housing Mortgage Corporation advanced money to Allied. However, with respect to fourteen lots, Housing made payments to Allied before they were due according to the loan schedule contained in the construction agreement. The Court held that these payments by Housing were voluntary and not obligatory under the construction loan and that the purchase money mortgage was not subordinated as to the voluntary payments. The court stated at 374 Pa. 318–321, 97 A.2d 805, 806:

On the contrary, the only reason for his subordination of his lien was, of course, that if the payments were advanced by Housing only as agreed upon, the Housing liens ahead of his own would increase in amount only as the mortgaged property simultaneously increased in value be-

cause of the concomitant progress in the work of construction.

.    .    .    .    .

The law is definitely established that an advance made pursuant to a mortgage to secure future advances which the mortgagee was not *obligated* to make, is subordinate in lien to an encumbrance intervening between the giving of the mortgage and the making of the advance, if the advance was made with actual notice or knowledge of the intervening encumbrance; the lien of an advance under such circumstances dates only from the time it was made and not from the time of the creation of the mortgage. In other words, after notice of the existence of a junior lien, the senior mortgagee will not be protected in making further advances under his mortgage unless he is under *a binding obligation* to make such advances:

(Emphasis in original)

Appellant argues that many of the advances made by ConFed were voluntary as not being in accordance with the schedule of operations and therefore as to the voluntary payments its lien is not subordinated to ConFed's. However, the schedule of operations was only an estimate of costs and it was filed because of banking regulations. Mr. Gunning, the President of ConFed, testified that he did not feel that ConFed was limited in making disbursements to the amount set forth in the schedule of operations. It must also be remembered that the schedule of operations was not a part of any of the agreements entered by any of the parties. The parties did not intend that the two houses would be completed for the advance of $70,400.00. General Development argues that disbursements were made for items not on the schedules of operations such as advertising, landscaping, a well, a garage, a heater and air conditioning. While this is correct, the items listed were all used in furtherance of the common interest of the parties which was to make the houses salable.

Mr. Gunning testified that when builders set up cost breakdowns they are only an estimate. He stated: "It is only a guess. It is very difficult for a subcontractor to give

a builder a written estimate, particularly because of inflation. And they are not—I don't want to be cruel but they are not the most educated people in the world. And a builder will set up a reserve or contingencies or miscellaneous, whatever that category may be in their mind. In that they build in interest and they build out of the pocket costs, whatever they think that they are going to run into, [that] they can anticipate that they are going to run into during the course of construction."

Mr. Dilsheimer admitted that although he had a copy of the schedule of operations prior to entering into the subordination agreement it was not incorporated into the agreement. He further agreed that there were no limits in the subordination agreement as to how the money was to be spent. The stated aim between Mr. Dilsheimer, President of General Development, Mr. Gunning, President of ConFed and Mr. Pusey, President of P. & C. Homes and Homes and Homesteads, Inc. was that the money should be spent in a way to make the houses salable. We believe the unsigned schedule of operations, which was not a part of any agreement, was not intended to be a blueprint for exact disbursement of funds which had to be followed by ConFed to protect its lien.

The three agreements entered into on December 24, 1975 all dealt with the same subject matter and should be interpreted together even though they were not made by the same parties. *See Housing Mortgage Corporation v. Allied Construction Co., Inc.*, 374 Pa. at 319, 97 A.2d at 805. The construction loan agreement of December 24, 1975, between ConFed and P. & C. Homes provided that ConFed would only be liable for "malfeasance in the application of the said fund" which it was loaning to P. & C. Homes. ConFed released funds to Homes & Homesteads, Inc. generally in accordance with the schedule of payments set forth in Article IX of the construction agreement between P. & C. Homes and Homes & Homesteads, Inc. It is correct that ConFed made payments to Homes & Homesteads, Inc. in the amount of some $20,000.00 for items such as advertising, excavating, construction of a garage, a heating system and

air conditioning, insurance, landscaping and installation of a well which items did not appear on the schedule of operations. The fact remains that all of the expenditures were directed at accomplishing the objective in which all parties were interested, namely, putting the houses in a condition to sell. Further, the parties did not intend that the houses would be completed for the sum of $70,400.00 as it was expected that it would cost a great deal more to complete them. The court below found that the disbursements made by ConFed were within the scope of the agreements with ConFed and that they were "based substantially" on the voucher system set forth in Article IX of the construction agreement between P. & C. Homes and Homes & Homesteads, Inc. Further, there is no evidence that the monies paid out by ConFed to Homes and Homesteads, Inc. were fraudulently disbursed or were diverted from the basic purpose of making the homes salable. As stated in *Cambridge Acceptance Corp. v. Hockstein*, 102 N.J.Super. 435, 246 A.2d 138, 140 (1968):

> The trial court regarded the present case as controlled by *Albert & Kernahan v. Franklin Arms, supra.* (96 N.J.Super., at p. 203, 146 A. 213). However, we do not read the opinion in that case as authority to the effect that the mere knowledge by a construction mortgagee that a prior lienor has given a subordination for the purpose of enabling the borrower to secure construction moneys to improve the premises operates *per se* to convert the construction lender into a guarantor to the subordinator that all money advanced on the loan will be applied to construction by the borrower.

Appellant contends that ConFed failed to retain ten percent of the funds loaned or $7,040.00 until the houses were completed. Article IX of the Construction Agreement between P. & C. and Homes and Homesteads, Inc. authorized ten per cent retainage until "full completion of the work". The contract did not contemplate that the homes were to be fully completed but only that there was to be full completion of the work to put them in a salable condition prior to the payment of the ten percent retainage.

Obviously, ConFed would not have loaned $70,400.00 additional funds to P. & C. Homes in the absence of the subordination agreement. If General Development was willing to subordinate its prior lien only upon ConFed's express guarantee that payments of funds would be made for specific purposes only, it could have so provided in the subordination agreement. However, this was not done. In *Grenada Ready-Mix Concrete, Inc. v. Watkins*, 453 F.Supp. 1298, 1312–15 (N.D.Miss.1978) which involved disbursement of funds by a construction lender which were insufficient to complete the project, the court stated " . . . when parties see fit to enter into contractual arrangements, their rights and obligations are to be measured by the terms thereof, without help or assistance from courts in adding to the agreement clauses which it would have been wise or useful to have employed in the first instance." 453 F.Supp. at 1313.

In this case appellant thought it was to its advantage to subordinate its lien to induce ConFed to loan additional funds to P. & C. Homes. The fact that the additional infusion of funds was not sufficient to save the project does not enable the appellant to nullify its subordination agreement and restore the priority of its purchase money mortgages.

Order affirmed.