434 So.2d 699 (1983)
The PEOPLES BANK AND TRUST COMPANY AND BANK OF MISSISSIPPI
v.
L & T DEVELOPERS, INC.; Joe L. Arick, D/B/A A & H Electrical and Refrigeration; and The Wickes Corp.
No. 54171.
Supreme Court of Mississippi.
June 1, 1983.
As Modified July 15, 1983.
*701 Riley & Weir, James Patrick Caldwell, Mitchell, Eskridge, Voge, Clayton & Beasley, Stephen M. Corban, Tupelo, for appellant.
Robert L. Lancaster, Carnathan & Malski, John M. Creekmore, Tupelo, Tubb, Stevens & Morrison and J. Joshua Stevens, Jr., West Point, for appellee.
Before PATTERSON, C.J., and ROY NOBLE LEE and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I. An Overview

This civil action arises from a residential construction fiasco in Clay County, Mississippi. In the salvage operation that has followed, the original landowner, holder of a subordinated purchase money deed of trust, is battling two construction lenders and two construction lienors, one a contractor and the other a materialman. The objects of the controversy are three tracts of land, two of which contain partially completed houses and the other of which is still unimproved.
*702 The matter was heard in the Chancery Court of Clay County. After receiving the post-trial submissions of the parties, the learned chancellor made extensive findings of facts and then decreed first priority in favor of the perfected liens of two construction lienors and second priority to the original landowner. A third priority, no doubt of minimal value, was given the two banks who served as construction lenders. The chancellor found that the proceeds of the construction loans never made their way into the improvements on any of the three tracts, and, moreover, that the banks had failed to exercise reasonable diligence to assure that the loan funds were used as all intended.
Having seen the priority of what they had thought were first deeds of trust evaporate, the construction lender banks are understandably miffed. They have appealed to this Court, seeking a holding that their liens have the first priority at the expense of both the materialmen and the purchase money deed of trust holder.
For the reasons set out below, we affirm.

II. The Facts

The cast of characters in this civil action includes:
(1) L & T Developers, Inc. a corporation organized, chartered and existing under the laws of the State of Mississippi having its principal place of business and domicile in Clay County, Mississippi. At all times relevant hereto, Herman M. Shirley was president of L & T, which is sometimes hereafter referred to as "Landowner". L & T was a plaintiff below and is one of the appellees here.
(2) Bruce Homes, Inc. was and is a corporation organized, chartered and existing under the laws of the State of Mississippi having its principal place of business and domicile in Clay County, Mississippi. At all times relevant hereto, William R. Bruce was president of Bruce Homes, Inc. Bruce Homes, Inc. is sometimes hereafter referred to as "Builder". Bruce was a defendant below but is not a party to this appeal.
(3) Bank of Mississippi is a banking association organized, chartered and existing under the laws of the State of Mississippi, having its principal place of business and domicile in Tupelo, Lee County, Mississippi. Bank of Mississippi is one of the construction lenders involved in this case and is sometimes hereafter referred to as "Construction Lender". Bank of Mississippi was a defendant below and is one of the appellants here.
(4) The Peoples Bank and Trust Company is also a banking association organized, chartered and existing under the laws of the State of Mississippi. Peoples Bank has its domicile and principal place of business in Lee County, Mississippi, but in this case was doing business through its Clay County branch. Peoples Bank is the other construction lender in this case and is sometimes hereinafter referred to as such. Peoples Bank was a defendant below and is one of the appellants here.
(5) Joe L. Arick is an adult resident citizen of West Point, Clay County, Mississippi. For present purposes, Arick does business as a sole proprietor operating under the trade name of A & H Electrical and Refrigeration. Arick is a contractor/construction lienor here and is sometimes hereinafter referred to as such. Arick was a defendant below and is one of the appellees here.
(6) The Wickes Corporation is a corporation organized, chartered and existing under the laws of the State of Mississippi having its principal place of business and domicile at Tupelo, Lee County, Mississippi. The Wickes Corporation is a materialman/construction lienor in this case and is sometimes hereinafter referred to as such.[1] Wickes was a defendant below and is one of the appellees here.
Prior to March 13, 1981, L & T Developers, Inc. was the owner of a substantial number of residential lots in the Shirley Subdivision in Clay County, Mississippi. *703 Each of these tracts was slightly more than one and one-half acres in size. On that date, March 13, 1981, L & T executed and delivered unto Bruce Homes, Inc. a warranty deed by which it conveyed these three tracts to Bruce Homes, Inc.
As consideration for the conveyance of these lots and contemporaneous with the execution and delivery of the warranty deed, Bruce Homes, Inc. executed in favor of L & T Developers, Inc. a promissory note in the principal sum of $24,000, representing a sales price of $8,000 per tract. In order to secure the payment of this note, and again on March 13, 1981, Bruce Homes, Inc. executed a purchase money deed of trust wherein these three lots, denominated Tracts Nos. I, II and III, were conveyed to James C. Helveston, as trustee for L & T Developers, Inc.
Bruce Homes, Inc. was a speculative builder. It planned to build a residential dwelling on each of the three tracts in question and, in due course, to sell each completed home and lot to a third party purchaser. The project was substantially undertaken on credit. Bruce persuaded L & T to finance the purchase of the three tracts. It then went to two banks, the Bank of Mississippi and the Peoples Bank, for loans to finance the construction of the three planned residential dwellings. Bruce Homes, Inc. negotiated three secured construction loans representing estimated 80 percent of the fair market value of the completed house and lot. Deeds of trust securing these loans were duly executed and properly placed of record. Bank of Mississippi was the construction lender for Tract No. I. Peoples Bank was the construction lender for Tract Nos. II and III. What happens after March 13 is essentially the same for each construction lender.
At this point in time, the lien of the purchase money deed of trust held by L & T Developers, Inc. was prior in right to the liens of each of the three deeds of trust in favor of the construction lenders. Shortly thereafter, L & T Developers, Inc. executed three subordination agreements wherein it agreed and provided that, "in accordance with our agreement in said deed of trust", the lien of its March 13, 1981, deed of trust was subordinated in favor of the construction lenders.
Nothing in any of the three subordination agreements, nor anything in any of the three deeds of trust, makes any express reference to the question of who will bear the risk of loss if the funds advanced under the construction loans were not used to construct the contemplated residential dwelling. Similarly, there is no express provision allocating the loss, if any, caused by the failure of either construction lender to use reasonable diligence to assure that the loan proceeds are used for their intended purposes.
The following summarizes the three loans:

 TRACT NO. I
Construction Lender: Bank of Mississippi
Amount of Loan: $32,000.00
Deed of Trust Filed for Record: March 27, 1981
Subordination Agreement Filed For
Record: April 6, 1981
 TRACT NO. II
Construction Lender: Peoples Bank & Trust Co.
Amount of Loan: $31,845.00
Deed of Trust Filed for Record: March 20, 1981
Subordination Agreement Filed for
Record: March 23, 1981
 TRACT NO. III
Construction Lender: Peoples Bank & Trust Co.
Amount of Loan: $31,605.00
Deed of Trust Filed for Record: March 27, 1981
Subordination Agreement Filed for
Record: April 6, 1981

On Tract No. I, the Bank of Mississippi proceeded to make periodic advances to Bruce, reaching the $32,000 mark by April 20, 1981. An additional advance of $5,000 was made on August 10, 1981. Because Bruce diverted these monies to other purposes, the home had not been completed by the time of trial. The estimated value of what had been erected was $30,000, plus the value of the land.
Similarly, the Peoples Bank made advances on Tract Nos. II and III. The last advance was made on April 21, 1981. The house on Tract No. II was never completed. *704 At trial it was established that the fair market value of what had been done was $13,500, plus the value of the land. No construction was ever begun on Tract No. III.
During the spring and early summer of 1981 Bruce Homes, Inc. was experiencing financial difficulties. Debts unrelated to the three tracts in question were pressing. These construction monies were diverted. The chancellor found as a fact that none of the loan proceeds disbursed by the two construction lenders between March and April of 1981 actually went into the construction of improvements on any of the three tracts. The chancellor further found as a fact that neither construction lender had exercised reasonable diligence to assure that the monies advanced were used by Bruce in the construction of improvements on any of the three tracts.
Arick performed all of the electrical, heating and air conditioning installation for Bruce on Tract No. I. The reasonable value of work done by Arick was $3,200.00. On October 8, 1981, Arick duly filed his Notice of Construction Lien in the office of the Chancery Clerk of Clay County, Mississippi, claiming a mechanic's and materialman's lien against the uncompleted dwelling on Tract No. I.
The Wickes Corporation provided materials and supplies that went into the uncompleted dwelling on Tract No. I, the reasonable value of which was $5,030.89. Wickes similarly provided materials and supplies that went into Tract No. II, the reasonable value of which was $2,387.77. On October 21, 1981, Wickes filed its Notice of Construction Liens in the office of the Chancery Clerk of Clay County, Mississippi.
Bruce, of course, defaulted on all of its obligations. It has not paid the $24,000 due L & T Developers on this lot, nor has it paid any part of the three construction loans, nor has it paid the two construction lienors. Presumably, Bruce is insolvent, both hopelessly and permanently so.
On November 3, 1981, L & T Developers, Inc. filed a civil action in the Chancery Court of Clay County, Mississippi, naming the Bank of Mississippi, Peoples Bank and Bruce Homes, Inc. as defendants. L & T sought an adjudication that the lien of its deed of trust would be deemed prior in right to that held by the construction lenders. At the same time L & T had a lis pendens notice placed against all three tracts. L & T filed a separate bill of complaint to foreclose lien on November 25, 1981. This time L & T joined not only the builder and the two construction lenders, but also a number of purported materialmen, mechanics and construction lienors. In this action L & T retraced much of the same ground as in the original suit and then asked a judicial foreclosure of its purchase money deed of trust on the three tracts of land.
On December 8, 1981, Peoples Bank conducted power of sale foreclosures on Tract Nos. II and III. Peoples Bank thereupon bid in and purchased both, the Trustee's Deeds reciting a sales price of $1,000 on Tract No. II and $500 on Tract No. III.
On December 22, 1981, Bank of Mississippi conducted a similar power of sale foreclosure and bid in Tract No. I for $1,000.

III. Scope of Review

Two critical fact questions were hotly litigated in the Chancery Court. First, were the proceeds of the two construction loans, or any part thereof, in fact used by Bruce Homes, Inc. in connection with the construction of residential dwellings on the three tracts in question, or were these monies used by Bruce for other purposes? Second, did the two construction lenders, or either of them, exercise reasonable diligence to assure that the proceeds of the construction loan were used to build the contemplated residences? On each of these issues the chancellor made clear findings of fact against the construction lenders.
Our scope of review of findings of fact made by a chancery court is, as all well know, quite limited. We must consider the evidence in the light most favorable to the party in whose favor the fact findings were made. We must also give that party the benefit of all reasonable favorable inferences *705 which may be drawn from the evidence. If when we do this we find that there is substantial evidence which supports the finding of fact made by the chancellor, we must affirm.
These principles are too well established to require extensive citation of authority. See, e.g., Blakeney v. Blakeney, 244 So.2d 3, 4 (Miss. 1971); Culbreath v. Johnson, 427 So.2d 705, 707-708 (Miss. 1983); and Griffith, Mississippi Chancery Practice (2d ed. 1950) § 674.
There is a corollary principle which should also be kept in mind as we proceed. It arises with respect to issues with respect to which the chancellor made no specific finding of fact. We are required by our prior decisions and by sound institutional considerations to assume that the chancellor resolved in favor of appellees all conflicts in the evidence on fact issues with respect to which the chancellor made no findings of fact. Harris v. Bailey Avenue Park, Inc., 202 Miss. 776, 791, 32 So.2d 689, 694 (1947).
Suffice it to say that we begin our consideration of the merits of this appeal with it established as a matter of fact
(a) that none of the funds derived from any of the three construction loans were actually used for the construction of anything on any of the three tracts of land here in dispute or on any of the improvements thereon, and
(b) that neither bank/construction lender exercised reasonable diligence to assure that the construction loan proceeds were used on any of the three tracts of land in question, or on any improvements thereon.

IV. Construction Lenders vs. Materialmen/Construction Lienors

A. The Equities Favor the Materialmen

We will first consider the conflicts in priority between the materialmen and the construction lenders. We begin by noting the common sense of the matter, the equities, if you will, favor the materialmen.
A materialman, a mechanic or other similar parties, such as Arick and Wickes here, typically furnishes supplies, materials or services which are indispensible to the successful prosecution of the construction project. That these potential lienors render their services and perform their work, generally on credit, is to everyone's benefit, including the construction lender. For as these parties give value, the value of the construction lender's collateral is enhanced.
If, as here, the materialmen are not paid, quite likely the construction lender will be unjustly enriched at their expense. For in this situation, if the construction lender were allowed a priority over the materialmen, it would have received the enhancement to the value of its collateral while the materialmen, without whose services the bank cannot expect the secured construction loan transaction to succeed, would as a practical matter be without security, and, most likely, with little prospect of getting paid.
We emphasize the case with which the construction lender may protect itself. Construction lenders may make advances in the form of drafts or checks payable directly to materialmen or payable to materialmen and the builder jointly. Such a practice, of course, would render the present fiasco impossible. Even where such tight controls are not exercised, many construction lenders require affidavits to the effect that all materialmen and potential construction lienors have been paid. Without doubt in this sort of situation the bank/construction lender is in a far better situation than is the materialman to protect itself and police the use of the construction loan funds and thereby avoid the predicament which has in fact ensued.

B. The Priority of the Construction Lender's Deed of Trust vs. the Materialmen's Liens

Against this backdrop, we emphasize the established facts in this case
(a) that none of the construction loan funds advanced by either construction lender went into any of the three lots in question,
(b) that neither construction lender exercised due diligence to assure that the loan *706 proceeds went into the three lots in question, or any of them, and
(c) that each of the two construction lienors here, The Wickes Corporation and Joe L. Arick, d/b/a A & H Electrical & Refrigeration, established that its respective goods and services did in fact go into the lots in question.
More particularly, the evidence established that the materials furnished by Wickes were in fact used by Bruce Homes, Inc. in the construction of Tract Nos. I and II. The amount of the lien allowed in favor of Wickes with respect to Tract No. I was $5,030.89 while the amount allowed against Tract No. II was $2,387.77.
Arick performed all of the electrical, heating and air conditioning installation on the home being constructed on Tract No. I. Without serious dispute the value of such work was $3,200.00.
Under these circumstances wherein the equities certainly favor Arick and Wickes, we would affirm the chancellor's holding in favor of the materialmen and against the construction lenders, absent some rule of the positive law requiring a contrary result. As will be explained below, this is an instance in which the law follows and embodies the equities.
Because we are concerned with a question of relative priorities among conflicting, perfected liens, we must also keep in mind the chronology.

 TRACT NO. I
October 8, 1981 - Arick files Notice of Construction Lien
 against Tract No. I.
 TRACT NO. I
October 21, 1981 - Wickes files Notice of Construction Lien
 against Tract No. I.
December 22, 1981 - Bank of Mississippi conducts Power of
 Sale Foreclosure on Tract No. I.
 TRACT NO. II
October 21, 1981 - Wickes files Notice of Construction Lien
 against Tract No. II.
December 8, 1981 - Peoples Bank conducts Power of Sale
 Foreclosure on Tract No. II.

Both Arick and Wickes perfected their liens against the tracts in question effective the date they filed their Construction Lien Notices. Section 85-7-131, Miss. Code Ann. (1972) provides in pertinent part:
Such lien shall take effect as to purchasers or encumbrancers for a valuable consideration without notice thereof, only from the time of commencing suit to enforce the lien, or from the time of filing the contract under which the lien arose, or notice thereof, in the office of the Clerk of the Chancery Court, ... [Emphasis added].
The statute does provide alternative means for perfecting the construction lien of the mechanic and materialmen, of the contractor and the subcontractor, and establishing its priority.[2] One of those means is filing notice of the lien in the office of the Chancery Clerk.[3] This was done by Arick on October 8, 1981, and by Wickes on October 21, 1981. On and from these dates the liens of Arick and Wickes stood perfected against all improvements on the two tracts.
What is before this court, however, is the challenge of construction lenders to the chancellor's holding giving these materialmen *707 rights in the two tracts having priority over the rights of the two construction lenders. First, the construction lenders claim that the liens of their respective deeds of trust became perfected in March of 1981 at the time of filing and are prior in right to the construction liens of the materialmen perfected in October of 1981 because they are prior in time of filing. Second, the construction lenders argue that, in any event, the power of sale foreclosures conducted in December of 1981 operated to extinguish all liens to the property and to transfer same to the proceeds of the foreclosure sales.
We will first consider the relative priorities of the parties under the deeds of trust vis-a-vis the construction liens. Our seminal decision here is First National Bank of Greenville v. Virden, 208 Miss. 679, 45 So.2d 268 (1950). In that case this Court recognized that materialmen and other construction lienors have at the time they supply materials or render services constructive notice of the construction lender's deed of trust and that it is contemplated that the lien of the construction lender's deed of trust "should be paramount". The Court went on to hold that the construction lender's lien

should not be extended any further than its equities require, and therefore should not be given priority, except to the extent that the money secured thereby was actually used in paying for the construction of the building. 208 Miss. at 685, 45 So.2d at 270. [Emphasis in original.]
The Court concluded by stating that the construction lender
should advance the proceeds with reasonable diligence in order that the holders of statutory liens may not be unjustly defeated in their claims. It is simple justice that such mortgagee [construction lender] shall have preference only to the extent that its funds actually went into the construction. 208 Miss. at 685, 45 So.2d at 270-271.
The rule has been fine tuned in many cases over the years. Recently in Guaranty Mortgage Co. of Nashville v. Seitz, 367 So.2d 438 (Miss. 1979) the Court summarized the present state of the law as follows:
The lien of a deed of trust securing a construction loan has priority over mechanics' and materialmen's liens only to the extent that: (a) the funds disbursed actually went into the construction, or (b) to the extent that the construction lender used reasonable diligence in disbursing the construction loan. 367 So.2d at 441. [Emphasis added]
A fair distillation of our cases on the subject runs something like this. The construction lender has a lien on the lot and all improvements by virtue of the deed of trust. The existence of the lien and its status as a perfected lien are wholly the function of the execution, delivery and recording of the deed of trust in accordance with our statutes pertaining thereto. The lien of the deed of trust exists and remains perfected even though not as much as one penny of the loan proceeds actually goes into the construction project.
The priority of the lien of the construction lender's deed of trust vis-a-vis materialmen, etc. is another matter. The construction lender holding a deed of trust, perfected prior in time to the perfection of the materialman's construction lien, has priority over the latter lien to the extent that the construction lender's funds actually go into the construction.
As a prerequisite to its being accorded priority over materialmen, etc. to the extent of any additional funds disbursed but not going into the construction project, the construction lender must show that it has used reasonable diligence to see that these funds were actually used in payment for labor, materials or other costs of construction. See, e.g., Guaranty Mortgage Co. of Nashville v. Seitz, 367 So.2d 438, 441 (Miss. 1979); Deposit Guaranty National Bank v. E.Q. Smith Plumbing & Heating, Inc., 392 So.2d 208, 212 (Miss. 1981).
We must apply these principles to the facts of this case. We reiterate that the chancellor found as a fact (a) that none of the funds disbursed by the construction *708 lenders actually went into the construction and (b) that neither construction lender used reasonable diligence to assure that the funds disbursed were actually going into the construction. On the other hand, the chancellor found that Arick's and Wickes' services and materials did go into the two tracts. On this point, accordingly, the decision in favor of Arick and Wickes and against the construction lenders must be affirmed.

C. The Rights of Construction Lenders as Purchasers at Power of Sale Foreclosure Vs. The Materialmen's Liens

1.
Notwithstanding the foregoing, the construction lenders assert a further thesis in support of reversal. They argue that the power of sale foreclosures in December of 1981 operated so as to convey clear title to the purchasers at the foreclosure sale, none other than the construction lender/banks themselves. The lien of the construction lienors/materialmen, together with the priority recognized under the reasonable diligence rule discussed in the preceding section, would attach to the proceeds of the foreclosure sale. The foreclosure itself, however, operated to extinguish the perfected construction liens in the property itself and to transfer those liens to the proceeds of the sales.
This argument must be considered in the context of the nature and theoretical under-girdings of the non-judicial power of sale foreclosure. Mississippi was one of the first states to adopt non-judicial foreclosure of mortgages and deeds of trust on real property. See Sims v. Hundly, 3 Miss. (2 How.) 896, 898-899 (1838). This type of foreclosure has now become dominant throughout the United States. See Comment, Due Process Problems of Mississippi Power of Sale Foreclosure, 47 Miss.L.J. 67, 69 (1976). In this state non-judicial foreclosures are authorized by legislative enactment. Miss. Code Ann. (1972) § 89-1-55.
Under our procedure the property is conveyed by the grantor (trustor) to a trustee, subject only to the requirements that the grantor/debtor perform the conditions and provisions of the deed of trust. See Miss. Code Ann. (1972) § 89-1-43. Once properly filed for record, the deed of trust is entitled to priority according to date of filing. Upon default by debtor in performance of the conditions of the trust, the trustee is empowered to foreclose. If the statutory requirements are observed, sale under the power is a perfect foreclosure. The trustee's deed is a conveyance absolute as though the trustee held fee simple title. It cuts off the equity of redemption and any other rights in and to the property (all of which are transferred to the foreclosure sale proceeds), with the sole exception of rights perfected prior to the filing of the deed of trust under which the foreclosure sale is held. See Hart v. Gardner, 81 Miss. 650, 33 So. 497 (1902).
As he executes the trustee's deed, the trustee in fact and in law possesses the same power to convey as any other person seized of title to real property. If one or more of the substantive conditions of the deed of trust have been breached substantially by the debtor/grantor, and if the trustee has complied with all of the procedural requisites (imposed by statute or by the trust deed itself), the foreclosing trustee's power to convey is as though he holds title by deed. The priority of his deed is determined by the date on which the deed of trust was filed for record. By trustee's deed he has the exact same power to convey free and clear of junior liens or interest as though he held a deed absolute filed for record the day the deed of trust was recorded.[4]
The theory of a power of sale foreclosure just stated has been accepted wherever non-judicial foreclosures are authorized by procedures similar to those found in our statutes. For example, the California case of Metropolis Trust & Savings Bank v. Barnet, 165 Cal. 449, 132 P. 833 (1913) held that *709 the purchaser from a trustee acquired absolute title to real property even though mechanics' lienors had suits pending to foreclose their liens at the time of the power of sale foreclosure. Tolleson v. Nobles, 152 S.W. 850 (Tex.Civ.App. 1913) is to like effect. Even a federal tax lien may be extinguished by a power of sale foreclosure in Mississippi. United States v. Boyd, 246 F.2d 477 (5th Cir.1957).
In the Boyd case the federal tax lien was junior in right to the first mortgage lien. Citing Sims v. Hundly, supra; Dibrell v. Carlisle, 48 Miss. (6 Morris) 691 (1873); and Hubbard v. Massey, 192 Miss. 95, 4 So.2d 230 (1941), the Court of Appeals correctly stated the Mississippi law as follows:
The result is that when a mortgage has been validly foreclosed by a non-judicial sale under a power, it is the consequence of such prior lien and the right of enforcement under it which destroys the junior encumbrance whether it be a private or federal tax lien. 246 F.2d at 483-484.
We return to the facts of this case. We note that at the time of the two foreclosure sales, the two materialmen's liens held by Arick and Wickes, respectively, had been perfected. The priority of those liens over the earlier filed deeds of trust of Bank of Mississippi and Peoples Bank, however, had not been finally established. Accordingly, under the general rule cited above, it might be persuasively argued that the power of sale foreclosures cut off all rights of Arick and Wickes in and to Tract Nos. I and II. Had the property been sold to purchasers who paid fair value at the foreclosure sales, the case might indeed be compelling.
We are concerned here, however, with foreclosure sales prices which are shockingly inadequate. The evidence suggests that the value of the improvements on Tract No. I at the time of trial was $30,000, not including the approximately $8,000 value of the lot. Bank of Mississippi bid in Tract No. I for the paltry sum of $1,000. The situation with Tract No. II is almost as egregious. The combined value of improvements ($13,500) and the lot ($8,000) is approximately $21,500. Peoples Bank purchased the lot at foreclosure for a like sum of $1,000.
If construction lenders such as these want the benefit of a perfect foreclosure under power of sale, including the power of the trustee to convey fee simple absolute title to the subject property, they must make reasonable, good faith (albeit conservative) bids at the foreclosure sale. This should not be hard to do, for our law recognizes that a foreclosure sale may be set aside because of an inadequate sales price only where the price is so low as to shock the conscience of the court or to amount to fraud. Smith v. General Investments, Inc., 246 Miss. 765, 769, 150 So.2d 862, 864 (1963); Central Financial Services, Inc. v. Spears, 425 So.2d 403 (Miss. 1983). Though arguably the mother of much mischief, this rule is well entrenched and we are not disposed to disturb it here.
We have here a situation, however, where Bank of Mississippi has successfully bid at foreclosure an amount equal to only 2.63 percent of the estimated fair market value of the subject property. Peoples Bank bid for Tract No. II an amount equal to only 4.65 percent of fair market value. Were this an action to set aside the foreclosure sales for lack of an adequate sales price, it would be hard to imagine on what basis the two banks might justify their conduct.[5]
Therefore, as purchasers at foreclosure with notice and for wholly inadequate considerations, the rights acquired by the two bank/construction lenders in and to Tracts Nos. I and II must, in equity and good conscience, be rendered subordinate to the claims of Arick and Wickes. Those prior claims are measured as follows: Arick and *710 Wickes must first exhaust the proceeds of sale (presumably still held by the trustee), according to their priorities vis-a-vis each other. (See Section VI below). To the extent either is still unpaid, it then has a perfected lien against Tract No. I or Tract No. 2, as the case may be. These liens are superior to the rights of the construction lenders in their capacity as holder of trustees' deeds.

2.
Though it contains language arguably in conflict with a part of what we have said above, Guaranty Mortgage Co. of Nashville v. Seitz, 367 So.2d 438 (Miss. 1979) also compels the result we reach here.[6]
In Seitz the Court was faced with a legally analogous situation. There the construction lender conducted a power of sale foreclosure after certain materialmen had filed notice of construction liens and one day after they filed suit to enforce those construction liens plus a lis pendens notice. The Seitz Court held that, when Guaranty Mortgage conducted its power of sale foreclosure and purchased the property at the trustee's sale, it took title subject to the contingency that the materialmen's liens were valid and enforceable. The Court reasoned that, if the holder of the deed of trust was allowed in this way to extinguish the liens of materialmen by power of sale foreclosures, priority rights granted to the materialmen under the statutory scheme and our prior case law would be effectively destroyed.
Construction lenders here argue that Seitz is not controlling. They point to the fact that in Seitz the materialmen had both filed notice of construction lien and filed suit to foreclose on the liens, while here only notice of construction lien has been filed. Surely this is a legally insignificant distinction. For as we have held above, Section 85-7-131 makes it clear beyond peradventure that the liens can be perfected, and their priority established, by the mere filing of the notice of construction lien, which here was done. Filing suit is a step toward enforcement (foreclosure, if you will) of the lien. In no way is it a prerequisite to perfection or priority.
Seitz suggests that the trustee at the power of sale foreclosure had no power to convey the subject property out from under the perfected liens of the materialmen, even to third party purchasers without actual notice of the existence of the liens and who pays a fair consideration.
The underlying premise here is that a mortgagee's rush to foreclosure should not be allowed to defeat otherwise enforceable rights. To the extent that Seitz prevented such from happening, it is sound.
Absent circumstances such as the shockingly inadequate foreclosure sales price here, there is ordinarily no reason why the materialmen's liens should remain impressed against the foreclosed property.[7] Those liens may be transferred to the sale proceeds. They would be entitled to such priority as the facts require, as per Section IV(B) above. The underlying goal of Seitz *711 is thus achieved. Seen in this light, Seitz should be read to provide that the conveyance via trustee's deed following foreclosure is made subject to the materialman's lien only where the mortgagee bids in the property at foreclosure for a price so shockingly low as would under established case law render it voidable, see Central Financial Service, Inc. v. Spears, 425 So.2d 403 (Miss. 1983), or where the mortgagee has been guilty of other similarly inequitable conduct. This is all that is necessary to avoid the prejudice to the rights of materialmen and other construction lienors which was the underlying aim of Seitz.
In this case there is little equity on the side of the two construction lender banks. Each had actual notice of the claims of Arick and Wickes before it became a purchaser at the foreclosure sale. Neither bank can assert with any credibility that it is a bona fide purchaser for value.
Had either bank at foreclosure decided to pay the fair market value of the properties, the equities might be different. For example, if Bank of Mississippi had in fact bid and paid to the trustee at the foreclosure sale a sum anywhere near the $38,000 estimated fair market value, we might have a different situation. Then there would be no equity in a holding to the effect that the perfected liens and security interests of the materialmen, etc. remained affixed to the foreclosed property. Those claims would, under the theory articulated above, be transferred to the sale proceeds. With priorities to be determined under the rule of First National Bank of Greenville v. Virden, supra, and progeny, Arick and Wickes would get their money.
What we actually have before us, however, is a horse of a different color. Bank of Mississippi, for example, purported to buy in an uncompleted residence having a fair market value of $38,000 for the princely sum of $1,000. Peoples Bank was almost as bad.
To allow these banks to thus defeat the perfected liens of the materialmen amounts to little short of highway robbery, which this Court is not about to sanction. In more formal legal terminology, on these facts the two banks are estopped to assert any rights in and to Tracts Nos. I, II, and III in any way having priority over other claimants.

D. The Chancellor's Finding of Fact That No Part of Proceeds of Bank of Mississippi's Loan Went Into Tract No. I Will Not Be Disturbed.

The evidence at trial reflected that $8,618.35 from Bruce's general funds went into the house on Tract No. I. On May 27, 1981, Bruce issued a check in that amount to pay earthmovers.
Bank of Mississippi seizes upon this and agrees that this $8,618.35 must have come from its advances. If so, Bank argues, it has first priority on Tract No. I, at least to the extent of the $8,618.35. The only problem with the argument is that the chancellor found as a fact that no funds advanced by Bank of Mississippi went into Tract No. I.
We agree that the evidence was less than conclusive on this point. And, if the chancellor had found that the $8,618.35 did come from Bank disbursements, such a finding would have been immune from reversal here  as immune as is the finding of fact actually made. See Section III above.
This assignment of error is thus without merit.

E. Summary

In summary, we affirm the decision of the Chancery Court that the construction liens of Arick and Wickes remain attached to Tract No. I and are perfected against and prior in right to any rights of Bank of Mississippi in and to Tract No. I. By the same token we affirm the chancellor's decision that the construction lien of Wickes in and to Tract No. II remains attached, perfected and prior in right to any rights of Peoples Bank.[8]
*712 We rest our decision here upon the factual premises that none of the construction funds went into either of these two tracts, that neither construction lender in fact exercised due diligence to supervise the use of the proceeds of the construction loans and that each construction lender bid in the tract subject to its deed of trust for a shockingly low consideration. Under these circumstances, the chancellor, in equity and good conscience, correctly decreed that any rights acquired by the construction lenders under their trustees' deeds are junior to these rights of the materialmen/construction lienors.

V. Construction Lenders Vs. Landowner

We now turn to the conflicting priority claims of the landowner and its supposedly subordinated purchase money deed of trust vis-a-vis the construction lenders. The landowner's claimed priority is arguably more troublesome than that of unpaid materialmen and construction lienors who are claimants normally thought to
stand upon a much higher plane than would the subordinated landowner who contributes no materials or efforts to the construction job, and who has at his disposal a means for protecting his interest in any commercial venture by insisting upon the inclusion of protective language in the documents compromising the [subordination] agreement. Grenada Ready-Mix Concrete, Inc. v. Watkins, 453 F. Supp. 1298, 1314 (N.D.Miss. 1978).
The Chancery Court nevertheless held that the landowner was the holder of a perfected security interest in Tracts I, II and III prior in right to any claims or interests of the two construction lenders. The Chancery Court emphasized its previously described findings of fact of lack of reasonable diligence on the part of the construction lenders and that no part of the construction funds went into the still uncompleted improvements on Tracts I and II.
The decision of the Chancery Court was ultimately predicated upon
inequitable conduct participated in by the construction money lender (banks) and the builder (Bruce) over which the landowner (L & T) had no control, and who is damaged unless this Court intervenes.
In the absence of an authoritative decision from this Court, the Chancery Court made its adjudication within the framework recognized by the United States District Court for the Northern District of Mississippi in Grenada Ready-Mix Concrete, Inc. v. Watkins, 453 F. Supp. 1298 (N.D.Miss. 1978). In Grenada Ready-Mix the District Court, faced with a duty to apply substantive Mississippi law (likewise in the absence of guidance by an authoritative decision of this Court[9]) stated the general rule as follows:
Absent express clauses in the loan documents directing or restricting the use of construction funds to a particular project, the subordinating landowner bears the risk of diversion by a developer who obtains a mortgage to finance improvements. 453 F. Supp. at 1314.
Judge Keady then recognized an exception to the general rule in cases where
the landowner can show fraud, collusion or other inequitable conduct participated in by the mortgagee and the mortgagor-developer. 453 F. Supp. at 1314.
Under these circumstances, the landowner's claims to the property should be given priority *713 over those of the construction lender. Relating this exception to the facts of the case under consideration, Judge Keady stated:
Of course, had Watkins [builder] used none of the loan funds at the Grenada site, and had Guaranty [construction lender] been aware of such diversion, that would constitute fraud or collusion justifying the Court in invalidating both the ground lease and the subordination executed by the landowner. 453 F. Supp. at 1313.
"Fraud" or "collusion" are strong words which in our view are inappropriate in the present factual context.[10] "Negligence" is a fairer appellation applied to the conduct of the construction lenders here. The Chancery Court described it as "inequitable conduct".
Pretermitting the necessity for deciding whether we should fall in line with the majority rule or the minority rule and likewise without worrying about whether we are dealing with the general rule recognized in Grenada Ready-Mix or the exception there noted, we think the rule which must be applied in this case is clear. That rule is this: Absent express agreement to the contrary,[11] a construction lender owes a duty to the landowner who subordinates his purchase money deed of trust. That duty is to exercise reasonable diligence to see that the funds loaned are in fact used in the construction project. If the construction lender fails to exercise reasonable diligence in this regard, its deed of trust will be prior in right to the landowner's purchase money deed of trust only to the extent that proceeds of the construction loan actually went into the construction project.[12]
The California case of Middlebrook-Anderson Co. v. Southwest Savings and Loan Association, 18 Cal. App.3d 1023, 96 Cal. Rptr. 338 (1971) justifies this rule as follows:
As between the seller and the lender, the lender is by far in the better position to control the use of the loan proceeds and thereby prevent misappropriations by the developer. The lender can require documented evidence that expenses have been incurred and can corroborate this by on-site inspections. It is common for lenders to control disbursements, since they, too, have an interest in preventing misuse of loan proceeds ...
An implied agreement in the instant case can and, in equity, should be spelled out from the lender's actual knowledge of the provisions of the seller's lien in general, and of the subordination therein in particular. In the superior position of a financial institution constantly engaged in professional construction lending, Southwest had no reason to believe their trust deed conferred any lien to which the fee was subordinate other than to the extent of money spent for construction purposes. Its loan under the circumstances cannot be viewed other than as subject to the fair application of the construction funds. Accordingly, we conclude that such lien as the trust deed might have conferred on the seller should not be advanced or preferred over the seller. 18 Cal. App.3d at 1036-1037, 96 Cal. Rptr. at 346-347.[13]
*714 We recognize, of course, that relative degrees of sophistication and bargaining power will vary from seller/landowner to seller/landowner and from construction lender to construction lender. Still it is a fair assumption, generally speaking, that
(A) The typical construction lender has greater expertise due to experience and proximity when it comes to supervising application of disbursements under a construction loan, and
(B) The typical construction lender because of his control of the actual disbursements has a far greater capacity to see to the application of the loan proceeds than does the typical landowner.
We emphasize that the rule enforced here in no way imposes upon the construction lender a standard of care foreign to that to which he is already subject under the positive law in this state. In our discussion in Section IV(B) above, we have noted that construction lenders for years have been subject to the duty to exercise reasonable diligence to see that their loan proceeds actually go into the construction project. For reasons which are surely obvious, the standard of care to which the construction lender should be held here should be the same vis-a-vis the original seller/subordinator/landowner as it is vis-a-vis the materialman/construction lienor.
The law either should  or should not  impose upon the construction lender the duty to exercise reasonable diligence to see that the funds loaned are in fact used on the project. No rational loan officer will choose to exercise such diligence  or decide to worry about that loan tomorrow  by reference to whether he happens to be thinking of potential conflicts with unpaid materialmen or with the unpaid subordinated purchase money lienor. The duties imposed by the law should be no more schizophrenic than are the people whose conduct they order.
For these reasons, so much of the decision of the Chancery Court as affirms the priority of the landowner L & T over the claims of the construction lenders is and should be affirmed.

VI. Materialmen/Construction Lienors Vs. Landowner

We have held above that the materialmen/construction lienors Arick and Wickes have perfected liens on the improvements on Tracts Nos. I and II, respectively, prior in right to the interests of the two construction lenders. We have similarly held above that the original landowner, L & T Developers, has a perfected security interest in and to Tract Nos. I, II and III prior in right to the interests of the two construction lenders. This leaves only the question of the relative priorities of the materialmen/construction lienors vis-a-vis the landowner.
The Chancery Court held that the materialmen/construction lienors' interest in these tracts was prior in right to the rights of the landowners. The point is not challenged on this appeal and seems to us intuitively correct. Wickes and Arick are parties who supplied materials and labor to the improvements on the two lots, thereby enhancing the value of these projects. Through sweat and elbow grease, these two construction lienors in a very real sense created value which previously was not there. The landowner, on the other hand, has made no similar contribution. The landowner had the far greater capacity to protect his interest, and, further, the landowner profits directly from the success of the overall construction project to which the materialmen so materially contribute.
Under these circumstances, we affirm the holding of the Chancery Court.
By way of recapitulation, we reemphasize that all five parties to this appeal hold perfected liens or security interests in and to one or more of the three tracts of land, the priorities and amounts of which are as follows:

 TRACT NO. I
 (1) (a) Materialman/construction lienor Arick $ 3,200.00
 (b) Materialman Wickes $ 5,030.89
 (2) L & T Developers, Inc. $ 8,000.00
 (3) Bank of Mississippi $32,000.00
 TRACT NO. II
 (1) Materialman Wickes $ 2,387.77
 (2) L & T Developers, Inc. $ 8,000.00
 (3) Peoples Bank & Trust Company $31,845.00

*715
 TRACT NO. III
 (1) L & T Developers, Inc. $ 8,000.00
 (2) Peoples Bank & Trust Company $31,605.00

The Chancery Court's decree affirmed here provides, inter alia, as follows:
That Peoples Bank and Trust Company and Bank of Mississippi are granted the option to within thirty (30) days of the date of this decree, to pay[14] said prior liens and all costs herein. That if said option is not exercised, said tracts shall be sold by judicial sales in accordance with the statutes in that regard made, and the proceeds of said sales shall be applied first to the payment of all court costs and then in accordance with the hereinabove ordered priority of liens.
We provide and direct that the thirty (30) day option period provided in the Chancery Court decree shall begin to run from the date of the final mandate to be issued by this Court. Subject to the holdings announced above and the reasoned elaborations thereof, the final decree of the Chancery Court is in all other respects affirmed.
AFFIRMED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, HAWKINS and DAN M. LEE, JJ., concur.
BOWLING and PRATHER, JJ., not participating.
NOTES
[1] From time to time below, Arick and Wickes are jointly referred to as "the materialmen", "the construction lienors", and the like.
[2] Our statute also provides that a contractor or subcontractor may establish the priority of his lien by filing suit to enforce it. To be sure, filing suit will cause such lien to "take effect as to purchasers or encumbrancers for a valuable consideration without notice thereof". Section 85-7-131; Self v. Nelson, 402 So.2d 822, 825 (Miss. 1981). Our statute and cases make it clear that filing suit is by no means the only way one can perfect and establish the priority of his lien. See text on page 710, infra.
[3] In 1964 the Mississippi Legislature enacted that the liens of laborers, mechanics, materialmen and others, be they contractor or subcontractor, may be perfected by filing alone. Miss. Laws, 1964, ch. 291, effective April 23, 1964, now codified as Miss. Code Ann. (1972) §§ 85-7-131, et seq. The Chancery Clerk in each county was directed to establish and maintain in his office, as a part of the land records of his county, a book entitled "Notice of Construction Liens". Once filed and recorded in this book, the lien without more is wholly perfected. In spite of the fact that some have perceived uncertainties regarding the matter, see Comment, Mississippi Law Governing Private Construction Contracts: Some Problems and Proposals, 47 Miss.L.J. 437 (1976), our present law allows and provides for perfection of the lien of the contractor or subcontractor by filing and recording in the Notice of Construction Liens book.
[4] For an excellent discussion of the theory of power of sale foreclosures, see Abbott, Some Basic Priority Problems In A Land Development Project, 50 Miss.L.J. 665, 681-695 (1979).
[5] See, for example, Central Financial Services, Inc. v. Spears, 425 So.2d 403 (Miss. 1983). There the mortgagee bid in the property for $1,458.86. Twelve days later mortgagee sold the property for $4,000.00, approximately 2.74 times as much as the foreclosure sales price. The foreclosure sales price was held "so inadequate that it shocks the conscience of this Court". 425 So.2d at 405.
[6] We proceed here aware that much thoughtful criticism has been leveled at our Seitz decision. One author has persuasively urged that this Court should "take the first opportunity to overrule its decision in Seitz". Abbott, Some Basic Priority Problems In A Land Development Project In Mississippi With Emphasis Upon Power of Sale Foreclosure Procedures, 50 Miss.L.J. 665, 681-688 (1979).
[7] The materialman faced with such a foreclosure is hardly defenseless.

Under these circumstances an action in chancery to enjoin the foreclosure is one remedy open to him. If he can establish that his rights may be subject to substantial prejudice if the foreclosure sale takes place, he may be entitled to relief. Proof of a substantial likelihood that at foreclosure there will be no bids in the amount of the lesser of the materialman's claim of the fair market value of the property may entitle him to relief.
Second, the materialman is always free to appear at the foreclosure sale and bid the amount of his unpaid bill. The construction lender will surely top that bid, in which event a foreclosure sales purse is created to which the materialman's lien and its priority then attach. Of course, if the construction lender for whatever reason declines to make such a bid and allows the materialman to buy the property at foreclosure, resale will likely produce bonanza profits for the materialman.
[8] As indicated elsewhere, Arick's and Wickes' liens and their priority transfer to the respective foreclosure sales proceeds  $1,000.00, in the case of Tract No. I and $1,000.00 in the case of Tract No. 2. Those funds should first be applied toward satisfaction of the Arick and Wickes debts. After this has been done, the two banks are estopped to deny either the perfection or the priority of Arick's and Wickes' liens against the tracts to the extent that the underlying debts remain unpaid.
[9] When faced with such situations, of course, the federal court is charged with making what has come to be known as the "Erie guess". The federal court must divine and enforce the rule that it believes this court would choose if the case were pending here. See Mason v. American Emery Wheel Works, 241 F.2d 906 (1st Cir.1957); Green v. Amerada-Hess Corp., 612 F.2d 212, 214 (5th Cir.1980); Wright, Law of Federal Courts (4th ed. 1983) 375. Judge Keady made such an Erie guess here, one with which we do not entirely concur. The adoption of our new Rule 46 authorizing the federal appellate courts to certify certain questions of Mississippi law to this Court should take some, but not all, of the guesswork out of the Erie guess.
[10] We are speaking here of the conduct of the two banks in failing to police their loans. The considerations paid at foreclosure remain as we have characterized them above, shockingly inadequate.
[11] There is no reason in law or policy why landowners and construction lenders should not be allowed by express agreement to abrogate or modify the duty here imposed on the construction lender. The rule stated above is that to be enforced absent express agreement to the contrary. That we ground that rule in the positive law of this state in no way suggests that we should not accord private lawmaking an overruling capacity.
[12] See, generally, the supportive discussion in Abbott, Some Basic Priority Problems In A Land Development Project In Mississippi With Emphasis Upon Power of Sale Foreclosure Procedures, 50 Miss.L.J. 665, 673-677 (1979).
[13] As indicated above, we do not rely here upon the fiction of an implied agreement between landowner and construction lender. The duty imposed upon the construction lender finds its source in the positive law. Middlebrook-Anderson gives a useful explanation of the reasonableness and fairness of the rule we recognize here.
[14] Any such payments may, of course, first exhaust the proceeds of the foreclosure sales "held" by the two banks.